RECEIPT # C 44462 11746?
AMOUNT $250
SUMMONS ISSUED Y-/
LOCAL RULE 4.1_____
WAIVER FORM _____
MCF ISSUED_____
BY DPTY. CLK. _plw_
DATE_____ 8-17-06

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DAVID J. FINE, in his capacity as Court-Appointed Ancillary Receiver of Bradford C. Bleidt and Allocation Plus Asset Management Company, Inc. and NANCY LOMBARD, LANGDON F. LOMBARD, DONNA BRANDT LAWRENCE, and BESSIE PANOS, individually and on behalf of a class of persons and entities similarly situated, | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) Civil Action No._____ ) ) |
| v. | ) ) ) |
| SOVEREIGN BANK, | ) ) |
| Defendant. | ) 06-11450 NG ) |

## COMPLAINT
### (Plaintiffs Demand Trial By Jury)

### Introduction

1.      In this action, the Ancillary Receiver and the named investor-clients, suing individually and as representatives of the class of similarly situated injured investor-clients, seek to recover damages on account of Sovereign Bank's tortious conduct including, among other things, its aiding and abetting Bradford Bleidt's breach of fiduciary duty to his company and to the company's investor-clients.

### Parties

2.      Plaintiff David J. Fine is a citizen of Massachusetts, residing in Newton, Middlesex County, Massachusetts. He is a plaintiff in this action in his capacity as Ancillary Receiver of Bradford C. Bleidt and Allocation Plus Asset Management Company, Inc.

("APAM") pursuant to an Order of this Court dated March 22, 2006 entered in Securities and Exchange Commission v. Bradford C. Bleidt, et al., Civil Action No. 04-12415-NG.

3.      Plaintiff Nancy Lombard is a citizen of Massachusetts, residing in Belmont, Middlesex County, Massachusetts.

4.      Plaintiff Langdon F. Lombard is a citizen of Massachusetts, residing in Belmont, Middlesex County, Massachusetts. He and plaintiff Nancy Lombard are husband and wife.

5.      Plaintiff Donna Branct Lawrence is a citizen of New Hampshire, residing in Portsmouth, Rockingham County, New Hampshire.

6.      Plaintiff Bessie Panos is a citizen of Massachusetts, residing in Newton, Middlesex County, Massachusetts.

7.      Defendant Sovereign Bank is a federally chartered savings bank examined by the Office of Thrift Supervision. Sovereign Bank has its principal place of business in Wyomissing, Berks County, Pennsylvania, and is deemed to be a citizen of Pennsylvania.


## Jurisdiction and Venue

8.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332 because all plaintiffs are citizens of states different from the state of which defendant is a citizen, and because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.      Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because the defendant is deemed to reside here pursuant to 28 U.S.C. §1391(c), given that it does business in Massachusetts and is, accordingly, subject to personal jurisdiction here, and also because a substantial part of the events and omissions giving rise to plaintiffs' claims occurred here.

2

Facts

Bleidt's Confession; Appointment of Ancillary Receiver

10.    On November 11, 2004, Bradford C. Bleidt ("Bleidt") mailed an audiotape to the Boston office of the Securities and Exchange Commission ("SEC"). In this audiotape, Bleidt confessed that, over the preceding 20 years, he had, through Allocation Plus Asset Management Company, Inc. ("APAM"), an investment advisory and asset management firm, defrauded his clients out of tens of millions of dollars.

11.    In response, the next day, November 12, 2004, the SEC commenced a lawsuit in this Court against Bleidt and APAM (Civil Action No. 04-12415) in an effort, among other things, to limit the damage caused by Bleidt's misconduct.

12.    On November 18 and 22, 2004, this Court entered Orders in Civil Action No. 04-12415 appointing David A. Vicinanzo as the Receiver for Bleidt and APAM.

13.    On March 22, 2006, this Court entered an Order in Civil Action No. 04-12415 appointing David J. Fine, the first-named plaintiff here, as Ancillary Receiver for Bleidt and APAM "in matters related to claims or potential claims against banks, including but not limited to Sovereign Bank . . . ." This Order "authorized, empowered and directed" Mr. Fine to "institute" and prosecute such "legal or equitable actions" as he deemed necessary and appropriate "to carry out [his] mandate."

14.    Plaintiff Fine is, together with the other plaintiffs, bringing the present lawsuit because he deems it necessary and appropriate to carry out his mandate as Ancillary Receiver pursuant to the foregoing Order.

3

Scope of Bleidt's Fraud; Bleidt's Use of
Sham APAM Bank Accounts to Perpetrate Fraud

15.    Starting in the mid-1980s and continuing until he confessed to the SEC in

November 2004, Bleidt defrauded 125 of his investor-clients of over $32.6 million.

16.    Nearly all of the money Bleidt stole from his clients was: (a) money that the

clients entrusted to him with the understanding, and on the condition, that Bleidt would invest

the money for the respective client's benefit; (b) money that was taken by Bleidt and deposited

by him not in a legitimate investment bank account but rather in a fraudulently operated bank

account; and (c) money that was disbursed from this bank account for Bleidt's improper, personal

uses.

17.    Initially, the bank accounts into which Bleidt fraudulently deposited investor

money were, on information and belief, personal bank accounts. In 1993, however, Bleidt's

modus operandi changed and, instead of depositing investor money in his personal bank

accounts, Bleidt opened a bank account that was nominally an APAM account but was actually a

sham account to be used fraudulently, and deposited the investor money he intended to steal in

that account. This first sham APAM account was a Bay Bank account and was used by Bleidt

from 1993 to, on information and belief, approximately mid-1995. In January 1995, Bleidt

opened a second sham APAM account at the 125 Causeway Street, Boston branch of Fleet Bank

(the "125 Causeway Street" branch). Bleidt used this second sham APAM account to steal

investor money from 1995 to November 2004.

Sovereign Bank's Acquisition of Fleet Branch Having Banking
Relationship With Bleidt and APAM, Including Acquisition of
Sham APAM Account

18.    To resolve antitrust concerns raised by the Justice Department regarding Fleet

Bank's proposed 1999 acquisition of BankBoston, Fleet Bank agreed in September 1999 to

4

divest itself of $13.2 billion in deposits in 306 branch offices in Massachusetts, New Hampshire, Rhode Island and Connecticut. The lion's share of this divestiture was accomplished by Fleet Bank agreeing to sell 285 branches and 578 ATMs to Sovereign Bank.

19.    Sovereign Bank acquired the foregoing branches and ATMs from Fleet in March-July 2000. Among the branches Sovereign Bank acquired was Fleet's 125 Causeway Street branch -- the branch where Bleidt maintained the sham APAM account referred to above. The effective date of the transfer of this sham APAM account from Fleet to Sovereign was June 18, 2000.

Client Losses During Period Sham APAM Account Was a Sovereign
Account, and Bleidt's Use of Money He Stole During this Period

20.    From June 18, 2000, the day the above-identified sham APAM account became a Sovereign account until the day Bleidt's fraudulent activities ceased in November 2004, Bleidt used this sham APAM account to steal over $22,028,000 from his clients.

21.    Attached to this Complaint as Exhibit 1 is a two-page spreadsheet showing the money Bleidt stole from his investor-clients. The portion of the spreadsheet shaded green isolates account activity pertaining to Bleidt's investor-clients. The column headed "Credits" lists the total amount of each investor-client's funds deposited into the sham APAM account during the period covered (June 18, 2000 to November 12, 2004). The column headed "Debits" lists the total amount paid from the sham APAM account to or for the respective investor-client. The column headed "Net" lists the difference between the respective "Credits" amount and the respective "Debits" amount, and thus shows the amount the investor-client in question lost. To protect the privacy of the investor-clients, all but the first letter of the last name of each investor-client in Exhibit 1 has been taped over. The dollar figures in Exhibit 1 are based on the

5

information plaintiffs have been able to obtain to date, and are subject to modification as
plaintiffs' investigation continues.

22.    The figures given at the bottom of the second page of the shaded-green portion of
the spreadsheet are the pertinent totals. Thus, the $32,827,666.46 figure is the total amount of
investor-client money deposited; the $10,799,609.91 figure is the total amount paid out of the
account to or for the benefit of the investor-clients; and the $22,028,056.55 figure is the total
amount investor-clients thereby lost.

23.    The Exhibit 1 spreadsheet also shows, in its unshaded portion, what Bleidt did
with the investor-client money he stole. The entries for "Shared Visions/WBIX," appearing on
the second page of the spreadsheet, are particularly noteworthy. (During the relevant time
period, WBIX Corp. operated an AM radio broadcasting business servicing the Boston
metropolitan area under the call letters WBIX 1060 AM. On or about July 16, 2002, Bleidt
entered into a stock Purchase and Sale Agreement with Alexander Langer to acquire all the stock
of WBIX Corp. for a purchase price of approximately $10 million. Simultaneously, as part of
that transaction, WBIX and Shared Visions, Inc. ("Shared Visions"), a corporation wholly owned
by Bleidt, entered into a Time Brokerage Agreement whereby Shared Visions undertook to
manage WBIX 1060 AM in anticipation of the eventual closing of the sale of the WBIX Corp.
stock to Bleidt or his nominee.) These entries show that while $439,925.00 of Shared
Visions/WBIX money was deposited into the account, $15,027,265.38 was paid from the
account to, or for the benefit of, Shared Visions/WBIX, yielding a net gain for Shared
Visions/WBIX of $14,587,340.38. In short, of the approximately $22 million Bleidt stole from
investor-clients during the covered period, Bleidt diverted nearly $15 million to Shared
Visions/WBIX.

6

Red Flags Regarding the Sham APAM Account

24.    There were many aspects of the sham APAM account, and the activity in that account, that either made Sovereign Bank aware, or reasonably should have made Sovereign Bank aware, that Bleidt was engaging in fraudulent or otherwise improper conduct. These included, without limitation, the following:

a.    Bank statements for the sham APAM account were sent to Bleidt's home address rather than to APAM's business address. That the address to which the statements were being sent was not APAM's business address was conspicuous by virtue of the fact that APAM's business address -- 164 Canal Street, Boston -- was printed on the checks for the account. The sending of the account statements to Bleidt's home address was particularly suspicious because there was no plausible business reason for doing this, especially given the nature of APAM's business (investing money for clients) and the fact that APAM's employees, including Bleidt, worked at APAM's 164 Canal Street office.

b.    The only person authorized to write or endorse checks, the only person authorized to apply for a loan on behalf of APAM, the only person authorized for the account of APAM to apply for and receive letters of credit, the only person authorized to initiate a wire transfer, indeed, the only person authorized to do anything regarding the account in question or anything on behalf of APAM vis-à-vis Sovereign Bank, was Bradford Bleidt. Given the nature of APAM's business, investing money on behalf of clients, and given that Bleidt was only one of several investment professionals working for APAM, this concentration of authority, and limitation of authority, to Bleidt and Bleidt alone was highly suspicious.

c.    The APAM account at Sovereign Bank was not the only APAM bank account. There was another, legitimate APAM account at Fleet. Sovereign Bank knew about, or

should have done sufficient investigation to discover the existence of, this other APAM account. This other, legitimate APAM account made the APAM account at Sovereign suspect. Sovereign Bank should have questioned why there was a need for two APAM accounts.

        d.      There were several aspects of the activity in the sham APAM account that were highly suspicious. These included:

        i.      numerous overdrafts. An overdraft in an account that is ostensibly being used to hold clients' money is a red flag because it warns that the fiduciary managing the account is not being as careful with his beneficiaries' money as he should be. Numerous overdrafts compound this warning.

        ii.      numerous rapid and substantial swings in the account balance. The account balance exhibited a pattern of fluctuating from a very high amount (in the hundreds of thousands of dollars) down to a very low or even overdrawn amount, then back to a very high amount often in the space of a week or two. This type of fluctuation was suspect because it did not square with the smoother and less volatile fluctuations one would have expected given the account's ostensible purpose.

        iii.      frequent substantial transfers of funds between this account and other non-APAM accounts at Sovereign Bank itself and at Fleet Bank. These transfers constituted red flags because, again, the transactions did not square with the ostensible nature of APAM's business, the investment of clients' money, and the ostensible role of the APAM account.

        e.      There were several unmistakable indicators that Bleidt was taking money from this APAM account and using it for: (i) personal purposes; and (ii) purposes inconsistent with the ostensible business of APAM. Looking at the checks drawn on the account, and at the

records of wire transfers out of the account, would have shown that Bleidt was using money entrusted to APAM by investor-clients to pay for such things as: (i) tuition to Cushing Academy, a private school attended by one of Bleidt's sons; (ii) tuition to St. Bonaventure University, a university attended by another of Bleidt's sons; (iii) rent for residences Bleidt was renting; (iv) payment for Celtics tickets; (v) a personal life insurance policy Bleidt had with Manhattan National Life; and (vi) direct payments to Denise Bleidt, Bleidt's ex-wife (see Exhibit 1 hereto showing that payments to Denise Bleidt out of the sham APAM account during the covered period totaled $403,052.69). Moreover, even without looking at the checks and wire transfer records themselves, Sovereign Bank should have been alerted to Bleidt's improper use of the funds entrusted to APAM by investor-clients by such facts as that: (1) the APAM account had an ATM feature which Bleidt used frequently to take money from the account in cash; and (2) there were, as stated earlier, frequent large transfers from the APAM account to Bleidt's personal account, to the bank account for Bleidt's radio station, and to the account for Financial Perspectives Planning Services, Inc. ("Financial Perspectives"), an investment advisory company headed by Bleidt. Sovereign Bank knew, or should have known, that one of the main purposes of these transfers was to pay the payroll for the radio station and for Financial Perspectives.

Financial Crimes Enforcement Network April 8, 2002 Assessment of
Civil Money Penalty Against Sovereign Bank, and Its Relevance Here

25.    At all relevant times, the Financial Crimes Enforcement Network ("FinCEN") has been the federal agency empowered to determine: (a) whether a financial institution, such as Sovereign Bank, violated the Bank Secrecy Act ("BSA"), 31 U.S.C. §§5311 et seq. and 31 CFR Part 103 thereunder; and (b) what, if any, sanction was appropriate.

9

26.    In April 2002, FinCEN issued an Assessment of Civil Money Penalty against Sovereign Bank. This Assessment is reproduced as Exhibit 2 hereto.

27.    The Assessment shows FinCEN determined: (a) "that from June 1998, through May 2001, Sovereign failed to file timely approximately 2000 Currency Transaction Report ("CTR") forms for currency transactions in amounts greater than $10,000 as required by 31 CFR §103.22" (Assessment, p. 1); (b) that "[o]ver a two-year period, Sovereign Bank had experienced a number of extraordinary events, including several mergers and acquisitions and systems conversions" (id. at p.2); (c) that "[t]hese events strained Sovereign's compliance systems, leading to the failure to file CTRs" (id.); and (d) "that Sovereign failed to implement sufficient internal controls and testing to insure that it filed accurate and timely CTRs, even after it was on notice that there were significant deficiencies in its BSA compliance" (id. at p.3).

28.    The Assessment further shows that, given the foregoing determinations, FinCEN "concluded that Sovereign's failures to file CTRs constitute[d] willful violations of the BSA" and assessed a civil money penalty against Sovereign of $700,000. Assessment, p.3.

29.    The foregoing Assessment is relevant here because: (a) it may be inferred that the same "extraordinary events" that FinCEN found to have "strained Sovereign's compliance systems, leading to the failure to file CTRs" in the period from June 1998 through May 2001, also strained Sovereign's compliance systems regarding, and during precisely the time it was taking over, the 125 Causeway Street branch and the sham APAM account; and (b) that this strain on Sovereign's compliance systems was a substantial contributing factor in Sovereign's failure to respond appropriately to the red flags regarding the sham APAM account. Further, the April 2002 Assessment is relevant because it should have been a wake-up call to Sovereign to strengthen its compliance systems, and it may be inferred that Sovereign's failure to respond

10

appropriately to this wake-up call was a substantial contributing factor in Sovereign's enabling Bleidt to continue his defrauding of his investor-clients, through the use of the sham APAM account at Sovereign, for the next two-and-a-half years.

Allegations Regarding Named Investor-Client Plaintiffs

30.    During the time the sham APAM account was a Sovereign account, the named investor-client plaintiffs lost the following amounts by virtue of deposits of their money into the sham APAM account:

    a.    plaintiff Nancy Lombard and Langdon F. Lombard lost over $1.6 million;

    b.    plaintiff Donna Brandt Lawrence lost over $1.6 million;

    c.    plaintiff Bessie Panos lost over $128,000.

31.    For each of the foregoing named plaintiffs, the loss of money caused extraordinary financial difficulties, and great and continuing emotional distress.

Class Action Allegations

32.    The plaintiffs named in paragraph 30 sue on behalf of themselves and on behalf of the class of persons and entities that entrusted money to APAM, had their money deposited in the sham APAM account at Sovereign Bank, and lost money as a result of their funds being used in a way contrary to the terms on which the investor-clients entrusted them to APAM.

33.    In addition, plaintiff Bessie Panos sues on behalf of the class of persons and entities that gave checks to APAM which checks were taken by Sovereign Bank and deposited in the sham APAM account notwithstanding that the checks were not properly endorsed. See Count IX below.

11

34.    With regard to each of the foregoing classes,

    a.    the class is so numerous that joinder of all members is impracticable;

    b.    there are questions of law or fact common to the class;

    c.    the claims of the representative parties are typical of the claims of the

class;

    d.    the representative parties will fairly and adequately protect the interests of

the class; and

    e.    the questions of law or fact common to the members of the class

predominate over any questions affecting only individual members, and a class action is superior

to other available methods for the fair and efficient adjudication of the controversy.

### Claims

### COUNT I --
### By Ancillary Receiver, for Aiding
### and Abetting Breach of Fiduciary Duty

35.    Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

36.    Bleidt owed a fiduciary duty to APAM, and both Bleidt and APAM owed a

fiduciary duty to APAM's investor-clients.

37.    Bleidt breached his fiduciary duty to APAM and to APAM's investor-clients, and

also caused APAM to breach its fiduciary duty to APAM's investor-clients, by using money

entrusted to APAM by the investor-clients contrary to the terms under which such money was

entrusted.

38.    Sovereign Bank knew, was willfully blind to and/or acted with reckless disregard as to whether Bleidt and APAM were breaching their foregoing fiduciary duties.

39.    Sovereign Bank acted in such a way as to assist substantially, and to aid and abet, Bleidt's and APAM's violation of their foregoing fiduciary duties.

40.    As a result of Bleidt's and APAM's violation of their foregoing fiduciary duties, and of Sovereign Bank's aiding and abetting such violation, APAM and APAM's investor-clients sustained severe injury, loss and damage.

### COUNT II --
#### By Ancillary Receiver, Under M.G.L. c.106 §3-307, for Taking Instruments with Notice of Breach of Fiduciary Duty

41.    Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

42.    At all relevant times, Sovereign Bank knew that Bleidt was a fiduciary owing fiduciary duties to APAM and to APAM's investor-clients.

43.    With regard to all checks and other negotiable instruments drawn, made or originating from investor-clients of APAM, which Bleidt deposited to the sham APAM account at Sovereign, Sovereign had "notice of [Bleidt's] breach of fiduciary duty" to APAM and to the investor-clients in question within the meaning of M.G.L. c.106 §3-307 because the sham APAM account was "an account other than an account of the fiduciary, as such, or an account of the represented person" (§3-307(b)(2)(iii)).

44.    Accordingly, Sovereign Bank is liable for all damage APAM sustained, and the investor-clients sustained, as a result of Sovereign's so accepting deposits to the sham APAM account.

13

## COUNT III --
### By Ancillary Receiver, for Negligence in Processing Transactions By Bleidt Sovereign Bank Knew or Should Have Known Were Beyond the Scope of the Authority Bleidt Had as APAM's Agent

45.     Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

46.     In making withdrawals from, drawing checks on, and sending wire transfers of funds out of, the sham APAM account, Bleidt was purportedly acting as the agent of APAM.

47.     With regard to the sham APAM account, APAM was Sovereign Bank's customer and Sovereign Bank accordingly owed APAM a duty of due care.

48.     The foregoing duty of care included a duty to exercise reasonable care with regard to the issue of whether Bleidt, as the agent of APAM, was authorized to make the withdrawals from, draw the checks on, and send the wire transfers of funds out of, the sham APAM account that he was making, drawing and sending.

49.     The duty to exercise reasonable care regarding the foregoing issue in turn required Sovereign Bank to take reasonable steps to investigate facts suggesting that Bleidt might be acting for his own personal purposes rather than for his principal's -- APAM's -- purposes.

50.     As alleged above, there were many such facts. But Sovereign Bank failed to take reasonable steps to investigate such facts.

51.     As a direct result of Sovereign Bank's foregoing failure to investigate, and of Sovereign Bank's overall violation of its duty of care regarding the issue of whether Bleidt was acting in breach of the authority Bleidt legitimately had as APAM's agent, APAM and APAM's investor-clients sustained severe injury, loss and damage.

14

## COUNT IV --
### By Ancillary Receiver, for Negligence that
### Effectively Permitted Bleidt to Shield His
### Fraudulent Conduct from the Scrutiny of the SEC

52.    Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

53.    At all relevant times, APAM was an investment advisory and asset management firm registered with the SEC, and Bleidt was an investment advisor registered with the SEC.

54.    At all relevant times, Sovereign Bank knew, or should have known, that APAM and Bleidt were so registered with the SEC, and that both APAM's and Bleidt's activities were regulated by applicable federal law and subject to the scrutiny and oversight of the SEC.

55.    Accordingly, Sovereign Bank was obligated to exercise due care to ensure that Bleidt and APAM were not engaging in banking transactions that would have the effect of shielding Bleidt's and APAM's activities from the scrutiny of the SEC, or that would otherwise frustrate such scrutiny or make such scrutiny more difficult.

56.    Bleidt did in fact engage in precisely such transactions. These transactions included, without limitation, causing the funds of investor-clients that Bleidt deposited in the sham APAM account to be transferred from that account to the bank account of Shared Visions. Shared Visions had a bank account at Sovereign, and one of the "benefits" that accrued to Bleidt from transferring investor-client funds from the sham APAM account to the Shared Visions account is that, unlike APAM, Shared Visions was not regulated by the SEC or subject to the scrutiny of the SEC.

57.    Accordingly, Bleidt's transfers of funds from the APAM account to the Shared Visions account was a species of money laundering.

58.    In the exercise of the duty of due care Sovereign Bank owed to its customer APAM and to APAM's investor-clients, Sovereign Bank should have been sensitive to the risk

15

of such money laundering and should, therefore, have conducted a reasonable investigation of the transfers from APAM to Shared Visions.

59.     Sovereign Bank failed to conduct such an investigation, and violated the duty of care it owed to APAM and APAM's investor-clients. As a direct result of this, APAM and APAM's investor-clients sustained severe injury, loss and damage.

### COUNT V --
### By Class Representatives, for Aiding
### and Abetting Breach of Fiduciary Duty

60.     Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

61.     The plaintiff class representatives incorporate herein the allegations of Count I above, and assert the claim made by those allegations as individuals and as class representatives.

### COUNT VI --
### By Class Representatives, Under M.G.L.
### c.106 §3-307, for Taking Instruments
### with Notice of Breach of Fiduciary Duty

62.     Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

63.     The plaintiff class representatives incorporate herein the allegations of Count II above, and assert the claim made by those allegations as individuals and as class representatives.

### COUNT VII --
### By Class Representatives, for Negligence in
### Processing Transactions By Bleidt Sovereign
### Bank Knew or Should Have Known Were Beyond
### the Scope of the Authority Bleidt Had as APAM's Agent

64.     Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

65.     The plaintiff class representatives incorporate herein the allegations of Count III

above, and assert the claim made by those allegations as individuals and as class representatives.

### COUNT VIII --
By Class Representatives, for Negligence that
Effectively Permitted Bleidt to Shield His
Fraudulent Conduct from the Scrutiny of the SEC

66.     Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

67.     The plaintiff class representatives incorporate herein the allegations of Count IV

above, and assert the claim made by those allegations as individuals and as class representatives.

### COUNT IX --
By Plaintiff Bessie Panos, Individually and as Class
Representative, for Common Law Conversion and Conversion
Within the Meaning of M.G.L. c.106 §3-420(a) Second Sentence

68.     Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

69.     Plaintiff Bessie Panos gave Bleidt several checks which Bleidt presented to

Sovereign Bank for deposit in the sham APAM account notwithstanding that the checks were not

properly endorsed. Such checks included, among others: (a) a check dated May 30, 2002 from

Penn Insurance and Annuity Company for $10,951.47 payable to Bessie Panos; (b) a check dated

October 25, 2002 from Penn Insurance and Annuity Company for $10,951.47 payable to Bessie

Panos; and (c) a check dated December 2, 2002 from Penn Insurance and Annuity Company for

$10,951.47 payable to Bessie Panos.

70.     Sovereign Bank accepted the foregoing checks for deposit into the sham APAM

account notwithstanding that each had no endorsement from the payee Bessie Panos.

17

71.    In accepting the foregoing checks for deposit, Sovereign Bank committed common law conversion and conversion within the meaning of the second sentence of M.G.L. c.106 §3-420(a).

72.    Accordingly, Sovereign Bank is liable to plaintiff Panos, and is liable to all other members of the class she represents regarding checks Sovereign Bank converted by accepting them for deposit in the sham APAM account notwithstanding that the checks were not properly endorsed.


## Prayer for Relief

WHEREFORE, plaintiffs respectfully request:

1.    that the Court enter judgment for plaintiffs on each Count of the Complaint awarding plaintiffs appropriate damages in excess of $75,000, plus interest, costs and attorney's fees; and

2.    that the Court grant such other and further relief as the Court may deem just and proper.

Dated: August 17, 2006

PLAINTIFFS DEMAND TRIAL BY JURY OF ALL ISSUES SO TRIABLE.

Respectfully submitted,

Of counsel to Plaintiff
Ancillary Receiver:

Melanie L. Oxhorn, Esq.
450 E. 63rd Street, Apt. 7G
New York, NY 10021
(212) 593-1462

David J. Fine, BBO #165120
Law Offices of David J. Fine
Three Center Plaza, Suite 400
Boston, MA 02108-2003
(617) 720-2941

Plaintiff Ancillary Receiver Pro Se

Nancy Lombard
c/o Law Offices of David J. Fine
Three Center Plaza, Suite 400
Boston, MA 02108-2003
(617) 720-2941

Plaintiff Pro Se

Langdon Lombard
c/o Law Offices of David J. Fine
Three Center Plaza, Suite 400
Boston, MA 02108-2003
(617) 720-2941

Plaintiff Pro Se

Donna Brandt Lawrence
c/o Law Offices of David J. Fine
Three Center Plaza, Suite 400
Boston, MA 02108-2003
(617) 720-2941

Plaintiff Pro Se

Sylvia Katsenes, BBO #408100
Katsenes and Katsenes
743 Washington Street
Newton, MA 02460
(617) 244-2137

Attorney for Plaintiff
Bessie Panos

19