UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID J. FINE, in his capacity as Court-       )
Appointed Ancillary Receiver of Bradford C.    )
Bleidt and Allocation Plus Asset Management    )
Company, Inc. and NANCY LOMBARD,               )
LANGDON F. LOMBARD, DONNA BRANDT               )
LAWRENCE, and BESSIE PANOS, individually       )
and on behalf of a class of persons and entities )
similarly situated,                            )
                                               )
                                               )       Civil Action No.06-11450-NG
               Plaintiffs,                     )
                                               )
       v.                                      )
                                               )
SOVEREIGN BANK,                                )
                                               )
               Defendant.                      )

AMENDED COMPLAINT
(Plaintiffs Demand Trial By Jury)

Introduction

1.      In this action, the Ancillary Receiver and the named investor-clients, suing

individually and as representatives of the class of similarly situated injured investor-clients, seek

to recover damages on account of Sovereign Bank's tortious conduct. The tortious conduct

includes: (a) aiding and abetting Bradford Bleidt's breach of fiduciary duty to his company and

the company's investor-clients; (b) taking instruments with notice of breach of fiduciary duty

within the meaning of M.G.L. c. 106 §3-307; (c) processing transactions which Sovereign Bank

knew or should have known were beyond the scope of Bleidt's authority as an agent; (d)

negligently permitting Bleidt to shield his fraudulent conduct from the SEC; and (e) commiting

unfair and deceptive acts and practices in violation of M.G.L. c. 93A.

## Parties

2.      Plaintiff David J. Fine is a citizen of Massachusetts, residing in Newton,

Middlesex County, Massachusetts. He is a plaintiff in this action in his capacity as Ancillary

Receiver of Bradford C. Bleidt and Allocation Plus Asset Management Company, Inc.

("APAM") pursuant to an Order of this Court dated March 22, 2006 entered in Securities and

Exchange Commission v. Bradford C. Bleidt, et al., Civil Action No. 04-12415-NG.

3.      Plaintiff Nancy Lombard is a citizen of Massachusetts, residing in Belmont,

Middlesex County, Massachusetts.

4.      Plaintiff Langdon F. Lombard is a citizen of Massachusetts, residing in Belmont,

Middlesex County, Massachusetts. He and plaintiff Nancy Lombard are husband and wife.

5.      Plaintiff Donna Brandt Lawrence is a citizen of New Hampshire, residing in

Portsmouth, Rockingham County, New Hampshire.

6.      Plaintiff Bessie Panos is a citizen of Massachusetts, residing in Newton,

Middlesex County, Massachusetts.

7.      Defendant Sovereign Bank is a federally chartered savings bank examined by the

Office of Thrift Supervision. Sovereign Bank has its principal place of business in Wyomissing,

Berks County, Pennsylvania, and is deemed to be a citizen of Pennsylvania.


## Jurisdiction and Venue

8.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332 because all

plaintiffs are citizens of states different from the state of which defendant is a citizen, and

because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and

costs.

2

9.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because the defendant is deemed to reside here pursuant to 28 U.S.C. §1391(c), given that it does business in Massachusetts and is, accordingly, subject to personal jurisdiction here, and also because a substantial part of the events and omissions giving rise to plaintiffs' claims occurred here.

Facts

Bleidt's Confession; Appointment of Ancillary Receiver

10.    On November 11, 2004, Bradford C. Bleidt ("Bleidt") mailed an audiotape to the Boston office of the Securities and Exchange Commission ("SEC"). In this audiotape, Bleidt confessed that, over the preceding 20 years, he had, through Allocation Plus Asset Management Company, Inc. ("APAM"), an investment advisory and asset management firm, defrauded his clients out of tens of millions of dollars.

11.    In response, the next day, November 12, 2004, the SEC commenced a lawsuit in this Court against Bleidt and APAM (Civil Action No. 04-12415) in an effort, among other things, to limit the damage caused by Bleidt's misconduct.

12.    On November 18 and 22, 2004, this Court entered Orders in Civil Action No. 04-12415 appointing David A. Vicinanzo as the Receiver for Bleidt and APAM.

13.    On March 22, 2006, this Court entered an Order in Civil Action No. 04-12415 appointing David J. Fine, the first-named plaintiff here, as Ancillary Receiver for Bleidt and APAM "in matters related to claims or potential claims against banks, including but not limited to Sovereign Bank . . . ." This Order "authorized, empowered and directed" Mr. Fine to "institute" and prosecute such "legal or equitable actions" as he deemed necessary and appropriate "to carry out [his] mandate."

3

14.     Plaintiff Fine is, together with the other plaintiffs, bringing the present lawsuit because he deems it necessary and appropriate to carry out his mandate as Ancillary Receiver pursuant to the foregoing Order.

Scope of Bleidt's Fraud; Bleidt's Use of
Sham APAM Bank Accounts to Perpetrate Fraud

15.     Starting in the mid-1980s and continuing until he confessed to the SEC in November 2004, Bleidt defrauded 125 of his investor-clients of over $32.6 million.

16.     Nearly all of the money Bleidt stole from his clients was: (a) money that the clients entrusted to him with the understanding, and on the condition, that Bleidt would invest the money for the respective client's benefit; (b) money that was taken by Bleidt and deposited by him not in a legitimate investment bank account (that is, an account subject to, and in compliance with, SEC requirements for bank accounts containing funds of investment advisory clients) but rather in a fraudulently operated bank account; and (c) money that was disbursed from this bank account for Bleidt's improper, personal uses.

17.     Initially, the bank accounts into which Bleidt fraudulently deposited investor money were, on information and belief, personal bank accounts. In 1993, however, Bleidt's modus operandi changed and, instead of depositing investor money in his personal bank accounts, Bleidt opened a bank account that was nominally an APAM account but was actually a sham account to be used fraudulently, and deposited the investor money he intended to steal in that account. This first sham APAM account was a Bay Bank account and was used by Bleidt from 1993 to, on information and belief, approximately mid-1995. In January 1995, Bleidt opened a second sham APAM account at the 125 Causeway Street, Boston branch of Fleet Bank (the "125 Causeway Street" branch). Bleidt used this second sham APAM account to steal investor money from 1995 to November 2004.

4

Sovereign Bank's Acquisition of Fleet Branch Having Banking
Relationship With Bleidt and APAM, Including Acquisition of
Sham APAM Account

18.     To resolve antitrust concerns raised by the Justice Department regarding Fleet

Bank's proposed 1999 acquisition of BankBoston, Fleet Bank agreed in September 1999 to

divest itself of $13.2 billion in deposits in 306 branch offices in Massachusetts, New Hampshire,

Rhode Island and Connecticut. The lion's share of this divestiture was accomplished by Fleet

Bank agreeing to sell 285 branches and 578 ATMs to Sovereign Bank.

19.     Sovereign Bank acquired the foregoing branches and ATMs from Fleet in March-

July 2000. Among the branches Sovereign Bank acquired was Fleet's 125 Causeway Street

branch -- the branch where Bleidt maintained the sham APAM account referred to above. The

effective date of the transfer of this sham APAM account from Fleet to Sovereign was June 18,

2000.

Client Losses During Period Sham APAM Account Was a Sovereign
Account, and Bleidt's Use of Money He Stole During this Period

20.     From June 18, 2000, the day the above-identified sham APAM account became a

Sovereign account until the day Bleidt's fraudulent activities ceased in November 2004, Bleidt

used this sham APAM account to steal over $22,028,000 from his clients.

21.     Attached to this Complaint as Exhibit 1 is a two-page spreadsheet showing the

money Bleidt stole from his investor-clients. The portion of the spreadsheet shaded green

isolates account activity pertaining to Bleidt's investor-clients. The column headed "Credits"

lists the total amount of each investor-client's funds deposited into the sham APAM account

during the period covered (June 18, 2000 to November 12, 2004). The column headed "Debits"

lists the total amount paid from the sham APAM account to or for the respective investor-client.

The column headed "Net" lists the difference between the respective "Credits" amount and the

respective "Debits" amount, and thus shows the amount the investor-client in question lost. To protect the privacy of the investor-clients, all but the first letter of the last name of each investor-client in Exhibit 1 has been taped over. The dollar figures in Exhibit 1 are based on the information plaintiffs have been able to obtain to date, and are subject to modification as plaintiffs' investigation continues.

22.     The figures given at the bottom of the second page of the shaded-green portion of the spreadsheet are the pertinent totals. Thus, the $32,827,666.46 figure is the total amount of investor-client money deposited; the $10,799,609.91 figure is the total amount paid out of the account to or for the benefit of the investor-clients; and the $22,028,056.55 figure is the total amount investor-clients thereby lost.

23.     The Exhibit 1 spreadsheet also shows, in its unshaded portion, what Bleidt did with the investor-client money he stole. The entries for "Shared Visions/WBIX," appearing on the second page of the spreadsheet, are particularly noteworthy. (During the relevant time period, WBIX Corp. operated an AM radio broadcasting business servicing the Boston metropolitan area under the call letters WBIX 1060 AM. On or about July 16, 2002, Bleidt entered into a stock Purchase and Sale Agreement with Alexander Langer to acquire all the stock of WBIX Corp. for a purchase price of approximately $10 million. Simultaneously, as part of that transaction, WBIX and Shared Visions, Inc. ("Shared Visions"), a corporation wholly owned by Bleidt, entered into a Time Brokerage Agreement whereby Shared Visions undertook to manage WBIX 1060 AM in anticipation of the eventual closing of the sale of the WBIX Corp. stock to Bleidt or his nominee.) These entries show that while $439,925.00 of Shared Visions/WBIX money was deposited into the account, $15,027,265.38 was paid from the account to, or for the benefit of, Shared Visions/WBIX, yielding a net gain for Shared

Visions/WBIX of $14,587,340.38. In short, of the approximately $22 million Bleidt stole from investor-clients during the covered period, Bleidt diverted nearly $15 million to Shared Visions/WBIX.

Red Flags Regarding the Sham APAM Account

24.    There were many aspects of the sham APAM account, and the activity in that account, that either made Sovereign Bank aware, or reasonably should have made Sovereign Bank aware, that Bleidt was engaging in fraudulent or otherwise improper conduct. These included, without limitation, the following:

a.    Bank statements for the sham APAM account were sent to Bleidt's home address rather than to APAM's business address. That the address to which the statements were being sent was not APAM's business address was conspicuous by virtue of the fact that APAM's business address -- 164 Canal Street, Boston -- was printed on the checks for the account. That Bleidt arranged for the account statements to be sent to his home address rather than to APAM's office address was highly suspicious because there was no plausible business reason for doing this (APAM's employees, including Bleidt, worked at APAM's 164 Canal Street office, as Sovereign Bank well knew), because the accounts were accounts into which Bleidt was depositing the funds of APAM's investor-clients, and because APAM was an investment advisory and asset management firm registered with the SEC, and was subject to the regulation and scrutiny of the SEC. The idea that Bleidt was having account statements sent to his home rather than APAM's office address for the purpose of hiding the account, or certain aspects of the activity in the account, from regulatory scrutiny must have occurred, or certainly should have occurred, to bank personnel.

7

b.     The only person authorized to write or endorse checks, the only person

authorized to apply for a loan on behalf of APAM, the only person authorized for the account of

APAM to apply for and receive letters of credit, the only person authorized to initiate a wire

transfer, indeed, the only person authorized to do anything regarding the account in question or

anything on behalf of APAM vis-à-vis Sovereign Bank, was Bradford Bleidt. Given the nature

of APAM's business, investing money on behalf of clients, and given that Bleidt was only one of

several investment professionals working for APAM, this concentration of authority, and

limitation of authority, to Bleidt and Bleidt alone was highly suspicious.

c.     The APAM account at Sovereign Bank was not the only APAM bank

account. There was another, legitimate APAM account at Fleet. Sovereign Bank knew about, or

should have done sufficient investigation to discover the existence of, this other APAM account.

This other, legitimate APAM account made the APAM account at Sovereign suspect. Sovereign

Bank should have questioned why there was a need for two APAM accounts.

d.     There were several aspects of the activity in the sham APAM account that

were highly suspicious. These included:

i.     numerous overdrafts. An overdraft in an account that is ostensibly

being used to hold clients' money is a red flag because it warns that the fiduciary managing the

account is not being as careful with his beneficiaries' money as he should be. Numerous

overdrafts compound this warning.

ii.     numerous rapid and substantial swings in the account balance. The

account balance exhibited a pattern of fluctuating from a very high amount (in the hundreds of

thousands of dollars) down to a very low or even overdrawn amount, then back to a very high

amount often in the space of a week or two. This type of fluctuation was suspect because it did

8

not square with the smoother and less volatile fluctuations one would have expected given the
account's ostensible purpose.

                iii.     frequent substantial transfers of funds between this account and
other non-APAM accounts at Sovereign Bank itself and at Fleet Bank. These transfers
constituted red flags because, again, the transactions did not square with the ostensible nature of
APAM's business, the investment of clients' money, and the ostensible role of the APAM
account.

                e.     There were several unmistakable indicators that Bleidt was taking money
from this APAM account and using it for: (i) personal purposes; and (ii) purposes inconsistent
with the ostensible business of APAM. Looking at the checks drawn on the account, and at the
records of wire transfers out of the account, would have shown that Bleidt was using money
entrusted to APAM by investor-clients to pay for such things as: (i) tuition to Cushing Academy,
a private school attended by one of Bleidt's sons; (ii) tuition to St. Bonaventure University, a
university attended by another of Bleidt's sons; (iii) rent for residences Bleidt was renting; (iv)
payment for Celtics tickets; (v) a personal life insurance policy Bleidt had with Manhattan
National Life; and (vi) direct payments to Denise Bleidt, Bleidt's ex-wife (see Exhibit 1 hereto
showing that payments to Denise Bleidt out of the sham APAM account during the covered
period totaled $403,052.69). Moreover, even without looking at the checks and wire transfer
records themselves, Sovereign Bank should have been alerted to Bleidt's improper use of the
funds entrusted to APAM by investor-clients by such facts as that: (1) the APAM account had
an ATM feature which Bleidt used frequently to take money from the account in cash; and (2)
there were, as stated earlier, frequent large transfers from the APAM account to Bleidt's personal
account, to the bank account for Bleidt's radio station, and to the account for Financial

Perspectives Planning Services, Inc. ("Financial Perspectives"), an investment advisory company

headed by Bleidt. Sovereign Bank knew, or should have known, that one of the main purposes

of these transfers was to pay the payroll for the radio station and for Financial Perspectives, a

blatantly improper and unauthorized use of money entrusted to APAM by its investor-clients

with the understanding, and on the condition, that the money would be invested for the clients'

benefit.

Financial Crimes Enforcement Network April 8, 2002 Assessment of
Civil Money Penalty Against Sovereign Bank, and Its Relevance Here

     25.     At all relevant times, the Financial Crimes Enforcement Network ("FinCEN") has

been the federal agency empowered to determine: (a) whether a financial institution, such as

Sovereign Bank, violated the Bank Secrecy Act ("BSA"), 31 U.S.C. §§5311 et seq. and 31 CFR

Part 103 thereunder; and (b) what, if any, sanction was appropriate.

     26.     In April 2002, FinCEN issued an Assessment of Civil Money Penalty against

Sovereign Bank. This Assessment is reproduced as Exhibit 2 hereto.

     27.     The Assessment shows FinCEN determined: (a) "that from June 1998, through

May 2001, Sovereign failed to file timely approximately 2000 Currency Transaction Report

("CTR") forms for currency transactions in amounts greater than $10,000 as required by 31 CFR

§103.22" (Assessment, p. 1); (b) that "[o]ver a two-year period, Sovereign Bank had experienced

a number of extraordinary events, including several mergers and acquisitions and systems

conversions" (id. at p.2); (c) that "[t]hese events strained Sovereign's compliance systems,

leading to the failure to file CTRs" (id.); and (d) "that Sovereign failed to implement sufficient

internal controls and testing to insure that it filed accurate and timely CTRs, even after it was on

notice that there were significant deficiencies in its BSA compliance" (id. at p.3).

28.    The Assessment further shows that, given the foregoing determinations, FinCEN "concluded that Sovereign's failures to file CTRs constitute[d] willful violations of the BSA" and assessed a civil money penalty against Sovereign of $700,000.  Assessment, p.3.

29.    The foregoing Assessment is relevant here because:  (a) it may be inferred that the same "extraordinary events" that FinCEN found to have "strained Sovereign's compliance systems, leading to the failure to file CTRs" in the period from June 1998 through May 2001, also strained Sovereign's compliance systems regarding, and during precisely the time it was taking over, the 125 Causeway Street branch and the sham APAM account; and (b) that this strain on Sovereign's compliance systems was a substantial contributing factor in Sovereign's failure to respond appropriately to the red flags regarding the sham APAM account.  Further, the April 2002 Assessment is relevant because it should have been a wake-up call to Sovereign to strengthen its compliance systems, and it may be inferred that Sovereign's failure to respond appropriately to this wake-up call was a substantial contributing factor in Sovereign's enabling Bleidt to continue his defrauding of his investor-clients, through the use of the sham APAM account at Sovereign, for the next two-and-a-half years.

Allegations Regarding Named Investor-Client Plaintiffs

30.    During the time the sham APAM account was a Sovereign account, the named investor-client plaintiffs lost the following amounts by virtue of deposits of their money into the sham APAM account:

      a.    plaintiff Nancy Lombard and Langdon F. Lombard lost over $1.6 million;

      b.    plaintiff Donna Brandt Lawrence lost over $1.6 million;

      c.    plaintiff Bessie Panos lost over $128,000.

31.     For each of the foregoing named plaintiffs, the loss of money caused

extraordinary financial difficulties, and great and continuing emotional distress.

Class Action Allegations

32.     The plaintiffs named in paragraph 30 sue on behalf of themselves and on behalf of

the class of persons and entities that entrusted money to APAM, had their money deposited in

the sham APAM account at Sovereign Bank, and lost money as a result of their funds being used

in a way contrary to the terms on which the investor-clients entrusted them to APAM.

33.     In addition, plaintiff Bessie Panos sues on behalf of the class of persons and

entities that gave checks to APAM which checks were taken by Sovereign Bank and deposited in

the sham APAM account notwithstanding that the checks were not properly endorsed.  See

Count IX below.

34.     With regard to each of the foregoing classes,

   a.     the class is so numerous that joinder of all members is impracticable;

   b.     there are questions of law or fact common to the class;

   c.     the claims of the representative parties are typical of the claims of the

class;

   d.     the representative parties will fairly and adequately protect the interests of

the class; and

   e.     the questions of law or fact common to the members of the class

predominate over any questions affecting only individual members, and a class action is superior

to other available methods for the fair and efficient adjudication of the controversy.

Claims

COUNT I --
By Ancillary Receiver, for Aiding
and Abetting Breach of Fiduciary Duty

35.    Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

36.    As an officer, director and shareholder of APAM, Bleidt owed a fiduciary duty to APAM, and both Bleidt and APAM owed a fiduciary duty to APAM's investor-clients.

37.    Bleidt breached his fiduciary duty to APAM and to APAM's investor-clients, and also caused APAM to breach its fiduciary duty to APAM's investor-clients, by using money entrusted to APAM by the investor-clients contrary to the terms under which such money was entrusted.

37A.    Sovereign Bank was well aware of the fiduciary duty owed by Bleidt to APAM, by APAM to its investor-clients and by Bleidt to APAM's investor-clients. Indeed, these fiduciary duties and the steps needed to avoid breaching them, were recognized in federal statutory and regulatory anti-fraud laws applicable to investment adviser businesses -- laws that the bank was charged with knowing because, among other things, such laws governed the manner in which advisory client funds were to be deposited and maintained at a bank, and because holder-in-due-course status could not be asserted by any bank having notice of a breach of fiduciary duty.

38.    Sovereign Bank knew, was willfully blind to and/or acted with reckless disregard as to whether Bleidt and APAM were breaching their foregoing fiduciary duties.

39.    Sovereign Bank acted in such a way as to assist substantially, and to aid and abet, Bleidt's and APAM's violation of their foregoing fiduciary duties.

40.     As a result of Bleidt's and APAM's violation of their foregoing fiduciary duties,

and of Sovereign Bank's aiding and abetting such violation, APAM and APAM's investor-

clients sustained severe injury, loss and damage.

### COUNT II --
### By Ancillary Receiver, Under M.G.L.
### c.106 §3-307, for Taking Instruments
### with Notice of Breach of Fiduciary Duty

41.     Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

42.     At all relevant times, Sovereign Bank knew that Bleidt was a fiduciary owing

fiduciary duties to APAM and to APAM's investor-clients.

43.     With regard to all checks and other negotiable instruments drawn, made or

originating from investor-clients of APAM, and with regard to all wire transfers originating from

such clients, which Bleidt deposited to the sham APAM account at Sovereign, Sovereign had

"notice of [Bleidt's] breach of fiduciary duty" to APAM and to the investor-clients in question

within the meaning of M.G.L. c.106 §3-307 because the sham APAM account was "an account

other than an account of the fiduciary, as such, or an account of the represented person" (§3-

307(b)(2)(iii)).

44.     Accordingly, Sovereign Bank is liable for all damage APAM sustained, and the

investor-clients sustained, as a result of Sovereign's so accepting deposits to the sham APAM

account.

### COUNT III --
### By Ancillary Receiver, for Negligence in
### Processing Transactions By Bleidt Sovereign
### Bank Knew or Should Have Known Were Beyond
### the Scope of the Authority Bleidt Had as APAM's Agent

45.     Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

46.     In making withdrawals from, drawing checks on, and sending wire transfers of funds out of, the sham APAM account, Bleidt was purportedly acting as the agent of APAM.

47.     With regard to the sham APAM account, APAM was Sovereign Bank's customer and Sovereign Bank accordingly owed APAM a duty of due care.

48.     The foregoing duty of care included a duty to exercise reasonable care with regard to the issue of whether Bleidt, as the agent of APAM, was authorized to make the withdrawals from, draw the checks on, and send the wire transfers of funds out of, the sham APAM account that he was making, drawing and sending.

49.     The duty to exercise reasonable care regarding the foregoing issue in turn required Sovereign Bank to take reasonable steps to investigate facts suggesting that Bleidt might be acting for his own personal purposes rather than for his principal's -- APAM's -- purposes.

50.     As alleged above, there were many such facts. But Sovereign Bank failed to take reasonable steps to investigate such facts.

51.     As a direct result of Sovereign Bank's foregoing failure to investigate, and of Sovereign Bank's overall violation of its duty of care regarding the issue of whether Bleidt was acting in breach of the authority Bleidt legitimately had as APAM's agent, APAM and APAM's investor-clients sustained severe injury, loss and damage.

COUNT IV --
By Ancillary Receiver, for Negligence that
Effectively Permitted Bleidt to Shield His
Fraudulent Conduct from the Scrutiny of the SEC

52.     Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

15

53.    At all relevant times, APAM was an investment advisory and asset management firm registered with the SEC, and Bleidt was an investment adviser registered with the SEC.

54.    At all relevant times, Sovereign Bank knew, or should have known, that APAM and Bleidt were so registered with the SEC, and that both APAM's and Bleidt's activities were regulated by applicable federal law and subject to the scrutiny and oversight of the SEC.

55.    Accordingly, Sovereign Bank was obligated to exercise due care to ensure that Bleidt and APAM were not engaging in conduct that would have the effect of shielding Bleidt's and APAM's activities from the scrutiny of the SEC, or that would otherwise frustrate such scrutiny or make such scrutiny more difficult.

56.    Bleidt did in fact engage in precisely such conduct. This conduct included, without limitation: (a) maintaining a bank account (the sham APAM account referred to above) into which Bleidt was depositing the funds of investor-clients, while concealing the existence of this account from the SEC; and (b) causing the funds of investor-clients that Bleidt deposited in the sham APAM account to be transferred from that account to the bank account of Shared Visions. Shared Visions had a bank account at Sovereign, and one of the "benefits" that accrued to Bleidt from transferring investor-client funds from the sham APAM account to the Shared Visions account is that, unlike APAM, Shared Visions was not regulated by the SEC or subject to the scrutiny of the SEC. Accordingly, Bleidt's transfers of funds from the APAM account to the Shared Visions account was a species of money laundering.

57.    Sovereign Bank knew, is deemed to have known or should have known that a bank account into which an investment adviser deposits the funds of his investor-clients is a bank account that is required to comply with SEC regulations pertaining to such bank accounts. These regulations include, among other things, a requirement that the investment adviser report the

16

existence of all such bank accounts to the SEC.

58.    Not only did Sovereign Bank fail to take any of the steps it should have taken to ensure that the bank account into which Bleidt was depositing client funds complied with SEC regulations; Sovereign Bank actually aided and abetted Bleidt's violation of such regulations by, among other things, sending the bank statements for this account to Bleidt's home address rather than to APAM's business address. Had the Bank sent the bank statements to APAM's business address, as the Bank clearly should have done, Bleidt would not have been able to conceal the existence of this account from the SEC, and would not have been able to use the account as he did, to steal money from his clients.

58A.    Further, in the exercise of the duty of due care Sovereign Bank owed to its customer APAM and to APAM's investor-clients, Sovereign Bank should have conducted a reasonable investigation of the transfers from APAM to Shared Visions.

59.    Sovereign Bank failed to conduct such an investigation, and otherwise violated the duty of care it owed to APAM and APAM's investor-clients by, among other things, aiding and abetting Bleidt's concealment of the sham APAM account from the SEC. As a direct result, APAM and APAM's investor-clients sustained severe injury, loss and damage.

COUNT V --
By Ancillary Receiver, for Violation of M.G.L. c. 93A

60.    Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

61.    At all relevant times, Sovereign Bank has engaged in trade and/or commerce within the meaning of M.G.L. c. 93A §2.

62.    Sovereign Bank has engaged in unfair and/or deceptive acts and/or practices within the meaning of M.G.L. c. 93A §2, as a direct result of which acts and/or practices APAM and APAM's investor-clients have sustained severe injury, loss and damage.

63.    The foregoing unfair and/or deceptive acts and/or practices are described in a demand letter that plaintiffs sent to Sovereign Bank on September 19, 2006, more than 30 days prior to the filing of this Amended Complaint. This demand letter is attached hereto as Exhibit 3.

64.    The description of the unfair and/or deceptive acts and/or practices committed by Sovereign Bank contained in plaintiffs' September 19, 2006 demand letter is incorporated herein by reference.

65.    Plaintiffs' September 19, 2006 letter made a written demand for relief within the meaning of M.G.L. c. 93A §9(3).

66.    On October 19, 2006, Sovereign Bank sent plaintiffs a letter, reproduced as Exhibit 4 hereto, responding to plaintiffs' September 19, 2006 demand. Sovereign Bank's response refused to make any tender of settlement in response to plaintiffs' demand.

67.    Sovereign Bank's refusal to grant relief upon demand was made in bad faith, with knowledge or reason to know that the conduct complained of violated M.G.L. c. 93A §2.

68.    Plaintiffs are entitled to multiple damages and attorney's fees both: (a) because of the inadequacy of Sovereign Bank's response to plaintiffs' demand letter; and (b) because the violations of M.G.L. c. 93A §2 by Sovereign Bank were willful and/or knowing violations.

69.    Plaintiffs are entitled to relief either under M.G.L. c. 93A §9 or under M.G.L. c. 93A §11.

COUNT VI --
By Class Representatives, for Aiding
and Abetting Breach of Fiduciary Duty

70.    Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

71.    The plaintiff class representatives incorporate herein the allegations of Count I

above, and assert the claim made by those allegations as individuals and as class representatives.


COUNT VII --
By Class Representatives, Under M.G.L.
c.106 §3-307, for Taking Instruments
with Notice of Breach of Fiduciary Duty

72.    Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

73.    The plaintiff class representatives incorporate herein the allegations of Count II

above, and assert the claim made by those allegations as individuals and as class representatives.


COUNT VIII --
By Class Representatives, for Negligence in
Processing Transactions By Bleidt Sovereign
Bank Knew or Should Have Known Were Beyond
the Scope of the Authority Bleidt Had as APAM's Agent

74.    Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

75.    The plaintiff class representatives incorporate herein the allegations of Count III

above, and assert the claim made by those allegations as individuals and as class representatives.


COUNT IX --
By Class Representatives, for Negligence that
Effectively Permitted Bleidt to Shield His
Fraudulent Conduct from the Scrutiny of the SEC

19

76.     Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

77.     The plaintiff class representatives incorporate herein the allegations of Count IV

above, and assert the claim made by those allegations as individuals and as class representatives.

### COUNT X --
### By Class Representatives, for Violation of M.G.L. c. 93A

78.     Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

79.     The plaintiff class representatives incorporate herein the allegations of Count V

above, and assert the claim made by those allegations as individuals and as class representatives.

### COUNT XI --
### By Plaintiff Bessie Panos, Individually and as Class
### Representative, for Common Law Conversion and Conversion
### Within the Meaning of M.G.L. c.106 §3-420(a) Second Sentence

80.     Plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

81.     Plaintiff Bessie Panos gave Bleidt several checks which Bleidt presented to

Sovereign Bank for deposit in the sham APAM account notwithstanding that the checks were not

properly endorsed. Such checks included, among others: (a) a check dated May 30, 2002 from

Penn Insurance and Annuity Company for $10,951.47 payable to Bessie Panos; (b) a check dated

October 25, 2002 from Penn Insurance and Annuity Company for $10,951.47 payable to Bessie

Panos; and (c) a check dated December 2, 2002 from Penn Insurance and Annuity Company for

$10,951.47 payable to Bessie Panos.

82.     Sovereign Bank accepted the foregoing checks for deposit into the sham APAM

account notwithstanding that each had no endorsement from the payee Bessie Panos.

20

83.     In accepting the foregoing checks for deposit, Sovereign Bank committed common law conversion and conversion within the meaning of the second sentence of M.G.L. c.106 §3-420(a).

84.     Accordingly, Sovereign Bank is liable to plaintiff Panos, and is liable to all other members of the class she represents regarding checks Sovereign Bank converted by accepting them for deposit in the sham APAM account notwithstanding that the checks were not properly endorsed.

Prayer for Relief

WHEREFORE, plaintiffs respectfully request:

1.     that the Court enter judgment for plaintiffs on each Count of the Complaint awarding plaintiffs appropriate damages in excess of $75,000, plus interest, costs and attorney's fees; and

2.    that the Court grant such other and further relief as the Court may deem just and proper.

Dated: December 7, 2006

PLAINTIFFS DEMAND TRIAL BY JURY OF ALL ISSUES SO TRIABLE.

Respectfully submitted,

Melanie L. Oxhorn, BBO No. 145458
450 E. 63rd Street, Apt. 7G
New York, NY 10021
(212) 593-1462

Counsel for Plaintiffs Nancy Lombard,
Langdon Lombard, Donna Brandt Lawrence,
and Bessie Panos

David J. Fine, BBO No. 165120
Law Offices of David J. Fine
Three Center Plaza, Suite 400
Boston, MA 02108-2003
(617) 720-2941

Plaintiff Ancillary Receiver Pro Se

Sylvia Katsenes, BBO No. 408100
Katsenes and Katsenes
743 Washington Street
Newton, MA 02460
(617) 244-2137

Co-Counsel for Plaintiff Bessie Panos

22