UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DAVID J. FINE, in his capacity as Court-Appointed Ancillary Receiver of Bradford C. Bleidt and Allocation Plus Asset Management Company, Inc. and NANCY LOMBARD, LANGDON F. LOMBARD, DONNA BRANDT LAWRENCE, and BESSIE PANOS, individually and on behalf of a class of persons and entities similarly situated, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | Civil Action No. 06-11450-NG |
| Plaintiffs, | ) ) ) | |
| JOEL ABRAMSON and MARY ABRAMSON; FRANCINE ACHBAR; MARTHA ANDERSON; CHARLES AUSTIN, as Trustee of SALEM-ZEBULUN COUNCIL; STEPHEN BAILEY; LORETTA BRIGHTMAN, as Executrix of the Estate of EDWARD BENDINELLI; ARTHUR BISENTI; AUBREY BISHOP, JR., as Trustee of IPSWICH-FERSON ROYAL ARCH CHAPTER; MARY FRANCES BLEIDT; LOUIS BOERI and CLAIRE BOERI; GEORGE BOLLN and NANCY BOLLN; PHILLIP BUCKLAND; ROBERT BUCKLEY and CLAIRE BUCKLEY; MARTHA CASHINS; EDWARD CHANDONNET; BARBARA COLBY; JEAN CORMIER; JOHN CORTON and MAUREEN CORTON; LORI DUTCH; ELENOR EDWARDS; JOHN EVANS; PHYLLIS FARINA, as Trustee of CARDARELLI FAMILY TRUST; FLAGSHIP TRAVEL, INC.; JOAN FRANCIS; ANNA FULGINTI; JAMIE GAFFNEY; AIDA ABBOUD GENNIS; THOMAS GENNIS; WAYNE ANDERTON, as Trustee of the PERMANENT FUND OF TYRIAN LODGE; BERNADETTE GILBERT, as Executrix of the ESTATE OF DONALD GILBERT; JOHN GILBERT, as Trustee of MASONS OF MASS SUTTON ROYAL & LYNN MASONIC TEMPLE ASSOC. and of MOUNT CARMEL LODGE; NANCY GOODWIN; ROBERT L. GOVE, as Trustee of ROBERT L. GOVE | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

TRUST; FRED GRECO, as Trustee of the )
BETHLEHEM LODGE AF & AM LODGE and )
as Trustee of the STEPHEN DAVID JOHNSON )
SCHOLARSHIP FUND; GREEK ORTHODOX )
CHURCH OF WESTON, INC.; HEALTHCARE )
FINANCIAL, INC.; ANNA IATRIDIS and )
CHRISTOS ZAHOPOULOS; DEMETRIUS )
IATRIDIS; J&J SALES AND MARKETING, )
INC.; JO-ANN RULISON, as Executor of the )
ESTATE OF MANUEL SCOTCH; ROBERT )
JOHNSTON, as Trustee of the MASTERS )
LODGE; DOROTHY JOHNSON, individually )
and as Executrix of the ESTATE OF THOMAS )
JOHNSON; GERALD H. JORDON, as Trustee of )
the JORDON MASONIC TEMPLE TRUST; )
WILLIAM KELLY; CATHERINE SYNNOTT, )
as Executrix of the ESTATE OF MARY )
KENNEDY; STEPHEN KING; WILLIAM )
KYDD, as Executor of the ESTATE OF )
CATHERINE KYDD; RICHARD E. LANDRY )
d/b/a LANDRY ARCHITECTS; RICHARD )
LANDRY and MAUREEN LANDRY; MARIE )
LEARY; JAMES LEGIER, as Trustee of the G. )
SIDNEY MACFARLANE PERMANENT FUND )
AND THE NASH SCHOLARSHIP FUND; )
BETH LUCHNER; RICHARD MAHAN and )
LYNN MAHAN; KATHLEEN MARINELLI, as )
Executor of the ESTATE OF JEAN SUTHERBY; )
PRISCILLA MARTIN, individually and as )
Executor of the ESTATE OF WAYNE MARTIN; )
SANDRA MCCARTHY; ALBERT )
MCMINOWAY and SUSAN MCMINOWAY; )
ELIZABETH MELLON, individually and as )
Executrix of the ESTATE OF FRED MELLON; )
SUSAN MOONEY, as Executrix of the ESTATE )
OF ELVIRA TRUMBULL; REBECCA )
MORRIS; CARY MOYER WARNER; )
WILLIAM MOYER and CAROL MOYER; )
JOHN MURPHY; STUART B. MUSHLIN, )
individually and as Trustee of the BEN ACHBAR )
EDUCATION TRUST; BETH NADEAU; )
MELINDA NEWTON PARKER; ELAINE )
PARKER; RICHARD PARKER; PAUL G. )
PEDEMONTI, as Trustee of TUNXIS VILLAGE )
CONDOMINIUM ASSOCIATION; BARBARA )
PERCY; MANUEL PESTANA; DIANE )

2

PHINNEY; WALTER POHLE and LORETTA      )
POHLE; ALINE PRINCE; DAVID      )
RICHARDSON and MARGIE RICHARDSON;      )
ALAN RICHMOND and GAIL RICHMOND;      )
MARY JANE RIVEST; ELIZABETH RUDDEN; )
GISELLE SHARAF; LEE JAMES SPINNEY;      )
BARBARA SPINNEY, as Administratrix of the      )
ESTATE OF ROBERT SPINNEY; WALTER      )
POHLE, as Trustee of the BAY STATE LODGE;  )
MICHAEL TENENBAUM, RICHARD      )
TENENBAUM and GAIL RICHMOND, as Co-      )
Executors of the ESTATE OF HELEN      )
TENENBAUM; MICHAEL TENNEY;      )
ARVARD TOMPKINS and DORRIS      )
TOMPKINS; MARILYN TULLY; LOUISE      )
TURNER; VASSILIOS VALAES; LINDA      )
VAUGHAN, as Executrix of the ESTATE OF      )
PAUL HANSCOME; RICHARD WILLENS;      )
LELAND WILSON; DONNA YAEGER; and      )
EDWARD YAEGER,      )
      )
                 Intervenor-Plaintiffs,      )
      )
      v.      )
      )
SOVEREIGN BANK,      )
      )
            Defendant.      )

---

## SECOND AMENDED COMPLAINT IN INTERVENTION
### (INTERVENOR PLAINTIFFS DEMAND TRIAL BY JURY)

### Introduction

1.     This Court having denied Plaintiffs' November 19, 2007 Motion for Class

Certification (docket #97) in an electronic Order issued November 25, 2008, and the plaintiffs

having filed on November 28, 2008 a Motion (docket #331) to allow the previously unnamed

investor-client victims to intervene as named plaintiffs in this action, and this Court having

issued an electronic Order on December 1, 2008 granting the November 28, 2008 Motion, the

above-identified, previously unnamed investor-client victims now file this Complaint in

Intervention setting forth the claims as to which they are intervening in this action.

Parties

2.      Plaintiff David J. Fine is a citizen of Massachusetts, residing in Newton,

Middlesex County, Massachusetts.  He is a plaintiff in this action in his capacity as Ancillary

Receiver of Bradford C. Bleidt and Allocation Plus Asset Management Company, Inc.

("APAM") pursuant to an Order of this Court dated March 22, 2006 entered in Securities and

Exchange Commission v. Bradford C. Bleidt, et al., Civil Action No. 04-12415-NG.

3.      Plaintiff Nancy Lombard is a citizen of Massachusetts, residing in Belmont,

Middlesex County, Massachusetts.

4.      Plaintiff Langdon F. Lombard is a citizen of Massachusetts, residing in Belmont,

Middlesex County, Massachusetts.  He and plaintiff Nancy Lombard are husband and wife.

5.      Plaintiff Donna Brandt Lawrence is a citizen of New Hampshire, residing in

Portsmouth, Rockingham County, New Hampshire.

6.      Plaintiff Bessie Panos is a citizen of Massachusetts, residing in Newton,

Middlesex County, Massachusetts.

7.      Intervenor plaintiffs Joel Abramson and Mary Abramson, husband and wife, are

each citizens of Massachusetts, residing in Swampscott, Massachusetts.

8.      Intervenor plaintiff Francine Achbar is a citizen of Massachusetts, residing in

Brookline, Massachusetts.

9.      Intervenor plaintiff Martha Anderson is a citizen of Massachusetts, residing in

Arlington, Massachusetts.

10.      Intervenor plaintiff Charles Austin, as trustee of the Salem-Zebulun Council, is a

4

citizen of Massachusetts, residing in Boston, Massachusetts.

11.    Intervenor plaintiff Stephen Bailey is a citizen of Massachusetts, residing in Cambridge, Massachusetts.

R 12.    Intervenor plaintiff Loretta Brightman, as Executrix of the Estate of Edward Bendinelli, is a citizen of Massachusetts, residing in Franklin, Massachusetts.

13.    Intervenor plaintiff Arthur Bisenti is a citizen of Massachusetts, residing in Haverhill, Massachusetts.

14.    Intervenor plaintiff Aubrey Bishop, Jr., as trustee of the Ipswich-Ferson Royal Arch Chapter, is a citizen of Massachusetts residing in Georgetown, Massachusetts.

15.    Intervenor plaintiff Mary Frances Bleidt is a citizen of West Virginia, residing in Charleston, West Virginia.

16.    Intervenor plaintiffs Louis Boeri and Claire Boeri, husband and wife, are each citizens of Massachusetts, residing in Wouburn, Massachusetts.

17.    Intervenor plaintiffs George Bolln and Nancy Bolln, husband and wife, are each citizens of New Hampshire, residing in Hebron, New Hampshire.

18.    Intervenor plaintiff Phillip Buckland is a citizen of New Hampshire, residing in Nashua, New Hampshire.

19.    Intervenor plaintiffs Robert Buckley and Claire Buckley, husband and wife, are each citizens of Florida, residing in Sarasota, Florida.

20.    Intervenor plaintiff Martha Cashins is a citizen of New Hampshire, residing in East Kingston, New Hampshire.

21.    Intervenor plaintiff Edward Chandonnet is a citizen of Massachusetts, residing in Lowell, Massachusetts.

22.    Intervenor plaintiff Barbara Colby is a citizen of Rhode Island, residing in North Kingstown, Rhode Island.

23.    Intervenor plaintiff Jean Cormier is a citizen of Massachusetts, residing in North Reading, Massachusetts.

24.    Intervenor plaintiffs John Corton and Maureen Corton, husband and wife, are each citizens of Florida, residing in Palm Bay, Florida.

25.    Intervenor plaintiff Lori Dutch is a citizen of Massachusetts, residing in Methuen, Massachusetts.

26.    Intervenor plaintiff Eleanor Edwards is a citizen of Massachusetts, residing in Framingham, Massachusetts.

27.    Intervenor plaintiff John Evans is a citizen of California, residing in San Geronimo, California.

28.    Intervenor plaintiff Phyllis Farina, as trustee of the Cardarelli Family Trust, is a citizen of Massachusetts, residing in Newton, Massachusetts.

29.    Intervenor plaintiff Flagship Travel, Inc. is a Massachusetts corporation having its principal place of business in Marblehead, Massachusetts.

30.    Intervenor plaintiff Joan Francis is a citizen of Massachusetts, residing in Somerville, Massachusetts.

31.    Intervenor plaintiff Anna Fulginti is a citizen of New Hampshire, residing in Londonberry, Massachusetts.

32.    Intervenor plaintiff Jamie Gaffney is a citizen of New Hampshire, residing in Atkinson, New Hampshire.

33.     Intervenor plaintiff Aida Abboud Gennis is a citizen of Massachusetts, residing in Wayland, Massachusetts.

34.     Intervenor plaintiff Thomas Gennis is a citizen of Massachusetts, residing in Wayland, Massachusetts.

R 35.   Intervenor plaintiff Wayne Anderton, as trustee of the Permanent Fund of Tyrian Lodge, is a citizen of Massachusetts, residing in Gloucester, Massachusetts.

35A.   Intervenor plaintiff Bernadette A. Gilbert, as executrix of the Estate of Donald Gilbert, is a citizen of Massachusetts, residing in Lynn, Massachusetts.

R 36.   Intervenor plaintiff John Gilbert, as Trustee of the Masons of Mass Sutton Royal & Lynn Masonic Temple Assoc. and as Trustee of the Mount Carmel Lodge, is a citizen of Massachusetts, residing in Lynn, Massachusetts.

37.     Intervenor plaintiff Nancy Goodwin is a citizen of Connecticut, residing in Southbury, Connecticut.

38.     Intervenor plaintiff Robert L. Gove, as trustee of the Robert L. Gove Trust, is a citizen of Massachusetts, residing in Peabody, Massachusetts.

39.     Intervenor plaintiff Fred Greco, as trustee of the Bethlehem Lodge AF & AM Lodge and as trustee of the Stephen David Johnson Scholarship Fund, is a citizen of Massachusetts, residing in Swampscott, Massachusetts.

40.     Intervenor plaintiff Greek Orthodox Church of Weston, Inc. is a Massachusetts corporation having its principal place of business in Weston, Massachusetts.

41.     Intervenor plaintiff Healthcare Financial, Inc. is a Massachusetts corporation having its principal place of business in Boston, Massachusetts.

R 42.   Intervenor plaintiffs Anna Iatridis and Christos Zahopoulos are each citizens of

Massachusetts, residing in Jamaica Plain, Massachusetts.

43.    Intervenor plaintiff Demetrius Iatridis is a citizen of Massachusetts, residing in West Newton, Massachusetts.

44.    Intervenor plaintiff J&J Sales and Marketing, Inc. is a Massachusetts corporation with its principal place of business in Woonsocket, Rhode Island.

R 45.    Intervenor plaintiff Robert Johnston, as trustee of the Masters Lodge, is a citizen of Massachusetts, residing in Nahant, Massachusetts.

R 46.    Intervenor plaintiffs Dorothy Johnson, individually and as Executrix of the Estate of Thomas Johnson, is a citizen of Massachusetts, residing in Holliston, Massachusetts.

47.    Intervenor plaintiff Gerald H. Jordon, trustee of the Jordon Masonic Temple Trust, is a citizen of Massachusetts, residing in Peabody, Massachusetts.

48.    Intervenor plaintiff William Kelly is a citizen of Massachusetts, residing in Marblehead, Massachusetts.

R 49.    Intervenor plaintiff Catherine Synnott, as Executrix of the Estate of Mary Kennedy, is a citizen of Massachusetts, residing in Watertown, Massachusetts.

50.    Intervenor plaintiff Stephen King is a citizen of Massachusetts, residing in Saugus, Massachusetts.

51.    Intervenor plaintiff William Kydd, as executor of the Estate of Catherine Kydd, is a citizen of Massachusetts, residing in Reading, Massachusetts.

52.  Intervenor plaintiff Richard E. Landry, d/b/a Landry Architects, is a citizen of New Hampshire, residing in Salem, New Hampshire.

53.    Intervenor plaintiffs Richard Landry and Maureen Landry, husband and wife, are each citizens of New Hampshire, residing in Salem, New Hampshire.

54.     Intervenor plaintiff Marie Leary is a citizen of Massachusetts, residing in Somerville, Massachusetts.

55.     Intervenor plaintiff James Legier, as trustee of the G. Sidney MacFarlane Permanent Fund and the Nash Scholarship Fund, is a citizen of New Hampshire, residing in Plaistow, New Hampshire.

56.     Intervenor plaintiff Beth Luchner is a citizen of Massachusetts, residing in Cambridge, Massachusetts.

57.     Intervenor plaintiffs Richard Mahan and Lynn Mahan, husband and wife, are each citizens of California, residing in Emeryville, California.

58.     Intervenor plaintiff Kathleen Marinelli, as executor of the Estate of Jean Sutherby, is a citizen of Massachusetts, residing in Saugus, Massachusetts.

59.     Intervenor plaintiff Priscilla Martin, individually and as Executor of the Estate of Wayne Martin, is a citizen of Massachusetts, residing in Marblehead, Massachusetts.

60.     Intervenor plaintiff Sandra McCarthy is a citizen of Massachusetts, residing in Braintree, Massachusetts.

61.     Intervenor plaintiffs Albert McMinoway and Susan McMinoway, husband and wife, are each citizens of Massachusetts, residing in Groveland, Massachusetts.

62.     Intervenor plaintiff Elizabeth Mellon, individually and as Executrix of the Estate of Fred Mellon, is a citizen of Massachusetts, residing in Lynn, Massachusetts.

63.     Intervenor plaintiff Susan Mooney, as Executrix of the Estate of Elvira Trumbull, is a citizen of Massachusetts, residing in Sutton, Massachusetts.

64.     Intervenor plaintiff Rebecca Morris is a citizen of Massachusetts, residing in

Burlington, Massachusetts.

R 65.    Intervenor plaintiff Cary Moyer Warner is a citizen of California, residing in San Francisco, California.

66.    Intervenor plaintiffs William Moyer and Carol Moyer, husband and wife, are each citizens of Connecticut, residing in West Simsbury, Connecticut.

67.    Intervenor plaintiff John Murphy is a citizen of Massachusetts, residing in Harwich, Massachusetts.

68.    Intervenor plaintiff Stuart B. Mushlin, individually and as trustee of the Ben Achbar Education Trust, is a citizen of Massachusetts, residing in Brookline, Massachusetts.

69.    Intervenor plaintiff Beth Nadeau is a citizen of Massachusetts, residing in Watertown, Massachusetts.

R 70.    Intervenor plaintiff Melinda Newton Parker is a citizen of Massachusetts, residing in Lynn, Massachusetts.

71.    Intervenor plaintiff Elaine Parker is a citizen of Massachusetts, residing in Middleton, Massachusetts.

72.    Intervenor plaintiff Richard Parker is a citizen of Massachusetts, residing in Lynn, Massachusetts.

73.    Intervenor plaintiff Paul G. Pedemonti, as trustee of the Tunxis Village Condominium Association, is a citizen of Connecticut, residing in Farmington, Connecticut.

74.    Intervenor plaintiff Barbara Percy is a citizen of Massachusetts, residing in Marblehead, Massachusetts.

75.    Intervenor plaintiff Manuel Pestana is a citizen of Massachusetts, residing in East Boston, Massachusetts.

76.    Intervenor plaintiff Diane Phinney is a citizen of New Hampshire, residing in Farmington, New Hampshire.

77.    Intervenor plaintiff Walter Pohle and Loretta Pohle, husband and wife, are each residents of Massachusetts residing in Lynn, Massachusetts.

78.    Intervenor plaintiff Aline Prince is a citizen of Massachusetts, residing in Lynn, Massachusetts.

79.    Intervenor plaintiffs David Richardson and Margie Richardson, husband and wife, are each citizens of Massachusetts, residing in Swampscott, Massachusetts.

80.    Intervenor plaintiffs Alan Richmond and Gail Richmond, husband and wife, are each citizens of Massachusetts, residing in Peabody, Massachusetts.

81.    Intervenor plaintiff Mary Jane Rivest is a citizen of New Hampshire, residing in Bristol, New Hampshire.

82.    Intervenor plaintiff Elizabeth Rudden is a citizen of Connecticut, residing in Farmington, Connecticut.

83.    Intervenor plaintiff Jo-Ann Rulison, as executor of the Estate of Manuel Scotch, is a citizen of Massachusetts, residing in Reading, Massachusetts.

84.    Intervenor plaintiff Giselle Sharaf is a citizen of Indiana, residing in Indianapolis, Indiana.

85.    Intervenor plaintiff Lee James Spinney is a citizen of Massachusetts, residing in Saugus, Massachusetts.

86A.   Intervenor plaintiff Barbara Spinney as Administratrix of the Estate of Robert Spinney, is a citizen of Massachusetts, residing in Saugus, Massachusetts.

86B.    Intervenor plaintiff Walter Pohle, as Trustee of the Bay State Lodge, is a citizen of Massachusetts, residing in Lynn, Massachusetts.

87.    Intervenor plaintiffs Michael Tenenbaum, Richard Tenenbaum, and Gail Richmond, as Co-Executors of the Estate of Helen Tenenbaum are citizens of Michigan, Massachusetts, and Massachusetts, respectively.  Michael Tenenbaum resides in Kalamazoo, Michigan.  Richard Tenenbaum resides in Salem, Massachusetts.  Gail Richmond resides in Peabody, Massachusetts.

88.    Intervenor plaintiff Michael Tenney is a citizen of Massachusetts, residing in Swampscott, Massachusetts.

89.    Intervenor plaintiffs Arvard Tompkins and Dorris Tompkins, husband and wife, are citizens of the U.S. Virgin Islands, residing in Christiansted St. Croix, US Virgin Islands.

90.    Intervenor plaintiff Marilyn Tully is a citizen of Massachusetts, residing in Framingham, Massachusetts.

91.    Intervenor plaintiff Louise Turner is a citizen of Massachusetts, residing in Arlington, Massachusetts.

92.    Intervenor plaintiff Vassilios Valaes is a citizen of Massachusetts, residing in Newtonville, Massachusetts.

93.    Intervenor plaintiff Linda Vaughan, as Executrix of the Estate of Paul Hanscome, is a citizen of Massachusetts, residing in Salem, Massachusetts.

94.    Intervenor plaintiff Richard Willens is a citizen of Massachusetts, residing in Somerville, Massachusetts.

95.    Intervenor plaintiff Leland Wilson is a citizen of Massachusetts, residing in Hull, Massachusetts.

96.    Intervenor plaintiff Donna Yaeger is a citizen of Massachusetts, residing in Lynn, Massachusetts.

97.    Intervenor plaintiff Edward Yaeger is a citizen of Massachusetts, residing in Lynn, Massachusetts.

R 98.    Defendant Sovereign Bank (also referred to herein as "Sovereign") is a federally chartered savings bank examined by the Office of Thrift Supervision.  Sovereign Bank has its principal place of business in Wyomissing, Berks County, Pennsylvania, and is deemed to be a citizen of Pennsylvania.

## Jurisdiction and Venue

99.    This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332 because all plaintiffs and intervenor plaintiffs are citizens of states different from the state of which defendant is a citizen, and because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

100.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because the defendant is deemed to reside here pursuant to 28 U.S.C. §1391(c), given that it does business in Massachusetts and is, accordingly, subject to personal jurisdiction here, and also because a substantial part of the events and omissions giving rise to plaintiffs' claims and intervenor plaintiffs' claims occurred here.

## Facts

### Bleidt's Confession; Appointment of Ancillary Receiver

101.    On November 11, 2004, Bradford C. Bleidt ("Bleidt") mailed an audiotape to the Boston office of the Securities and Exchange Commission ("SEC").  In this audiotape, Bleidt confessed that, over the preceding 20 years, he had, through Allocation Plus Asset Management

Company, Inc. ("APAM"), an investment advisory and asset management firm, defrauded his clients out of tens of millions of dollars.

102.     In response, the next day, November 12, 2004, the SEC commenced a lawsuit in this Court against Bleidt and APAM (Civil Action No. 04-12415) in an effort, among other things, to limit the damage caused by Bleidt's misconduct.

103.     On November 18 and 22, 2004, this Court entered Orders in Civil Action No. 04-12415 appointing David A. Vicinanzo as the Receiver for Bleidt and APAM.

104.     On March 22, 2006, this Court entered an Order in Civil Action No. 04-12415 appointing David J. Fine, the first-named plaintiff here, as Ancillary Receiver for Bleidt and APAM "in matters related to claims or potential claims against banks, including but not limited to Sovereign Bank . . . ."  This Order "authorized, empowered and directed" Mr. Fine to "institute" and prosecute such "legal or equitable actions" as he deemed necessary and appropriate "to carry out [his] mandate."

105.     Plaintiff Fine is, together with the other plaintiffs and intervenor plaintiffs, bringing the present lawsuit because he deems it necessary and appropriate to carry out his mandate as Ancillary Receiver pursuant to the foregoing Order.

Scope of Bleidt's Fraud; Bleidt's Use of
Sham APAM Bank Accounts to Perpetrate Fraud

106.     Starting in the mid-1980s and continuing until he confessed to the SEC in November 2004, Bleidt defrauded 125 of his investor-clients of over $32.6 million.

107.     Nearly all of the money Bleidt stole from his clients was:  (a) money that the clients entrusted to him with the understanding, and on the condition, that Bleidt would invest the money for the respective client's benefit; (b) money that was taken by Bleidt and deposited by him not in a legitimate investment bank account but rather in a fraudulently operated bank

account; and (c) money that was disbursed from this bank account for Bleidt's improper, personal uses.

108.    Initially, the bank accounts into which Bleidt fraudulently deposited investor money were, on information and belief, personal bank accounts.  In 1993, however, Bleidt's modus operandi changed and, instead of depositing investor money in his personal bank accounts, Bleidt opened a bank account that was nominally an APAM account but was actually a sham account to be used fraudulently, and deposited the investor money he intended to steal in that account.  This first sham APAM account was a Bay Bank account and was used by Bleidt from 1993 to, on information and belief, approximately mid-1995.  In January 1995, Bleidt opened a second sham APAM account at the 125 Causeway Street, Boston branch of Fleet Bank (the "125 Causeway Street" branch).  Bleidt used this second sham APAM account to steal investor money from 1995 to November 2004.

Sovereign Bank's Acquisition of Fleet Branch Having Banking
Relationship With Bleidt and APAM, Including Acquisition of
Sham APAM Account

109.    To resolve antitrust concerns raised by the Justice Department regarding Fleet Bank's proposed 1999 acquisition of BankBoston, Fleet Bank agreed in September 1999 to divest itself of $13.2 billion in deposits in 306 branch offices in Massachusetts, New Hampshire, Rhode Island and Connecticut.  The lion's share of this divestiture was accomplished by Fleet Bank agreeing to sell 285 branches and 578 ATMs to Sovereign Bank.

110.    Sovereign Bank acquired the foregoing branches and ATMs from Fleet in March-July 2000.  Among the branches Sovereign Bank acquired was Fleet's 125 Causeway Street branch -- the branch where Bleidt maintained the sham APAM account referred to above.  The

effective date of the transfer of this sham APAM account from Fleet to Sovereign was June 18, 2000.

Client Losses During Period Sham APAM Account Was a Sovereign
Account, and Bleidt's Use of Money He Stole During this Period

111.    From June 18, 2000, the day the above-identified sham APAM account became a Sovereign account until the day Bleidt's fraudulent activities ceased in November 2004, Bleidt used this sham APAM account to steal over $22,028,000 from his clients.

112.    Attached to plaintiffs' December 7, 2006 Amended Complaint in this action as Exhibit 1 was a two-page spreadsheet showing the money Bleidt stole from his investor-clients. Intervenor plaintiffs incorporate that spreadsheet herein by reference.

Red Flags Regarding the Sham APAM Account

113.    There were many aspects of the sham APAM account, and the activity in that account, that either made Sovereign Bank aware, or reasonably should have made Sovereign Bank aware, that Bleidt was engaging in fraudulent or otherwise improper conduct. These included, without limitation, the following:

        a.      Bank statements for the sham APAM account were sent to Bleidt's home address rather than to APAM's business address. That the address to which the statements were being sent was not APAM's business address was conspicuous by virtue of the fact that APAM's business address -- 164 Canal Street, Boston -- was printed on the checks for the account. That Bleidt arranged for the account statements to be sent to his home address rather than to APAM's office address was highly suspicious because there was no plausible business reason for doing this (APAM's employees, including Bleidt, worked at APAM's 164 Canal Street office, as Sovereign Bank well knew), because the accounts were accounts into which Bliedt was depositing funds of APAM's investor-clients, and because APAM was an investment advisory

and asset management firm registered with the SEC, and was subject to the regulation and scrutiny of the SEC.  The idea that Bleidt was having account statements sent to his home rather than APAM's office address for the purpose of hiding the account, or certain aspects of the activity in the account, from regulatory scrutiny must have occurred, or certainly should have occurred, to bank personnel.

   b.  The only person authorized to write or endorse checks, the only person authorized to apply for a loan on behalf of APAM, the only person authorized for the account of APAM to apply for and receive letters of credit, the only person authorized to initiate a wire transfer, indeed, the only person authorized to do anything regarding the account in question or anything on behalf of APAM vis-à-vis Sovereign Bank, was Bradford Bleidt.  Given the nature of APAM's business, investing money on behalf of clients, and given that Bleidt was only one of several investment professionals working for APAM, this concentration of authority, and limitation of authority, to Bleidt and Bleidt alone was highly suspicious.

   c.  The APAM account at Sovereign Bank was not the only APAM bank account.  There was another, legitimate APAM account at Fleet.  Sovereign Bank knew about, or should have done sufficient investigation to discover the existence of, this other APAM account.  This other, legitimate APAM account made the APAM account at Sovereign suspect.  Sovereign Bank should have questioned why there was a need for two APAM accounts.

   d.  There were several aspects of the activity in the sham APAM account that were highly suspicious.  These included:

     i.  numerous overdrafts.  An overdraft in an account that is ostensibly being used to hold clients' money is a red flag because it warns that the fiduciary managing the

account is not being as careful with his beneficiaries' money as he should be. Numerous overdrafts compound this warning.

        ii.     numerous rapid and substantial swings in the account balance. The account balance exhibited a pattern of fluctuating from a very high amount (in the hundreds of thousands of dollars) down to a very low or even overdrawn amount, then back to a very high amount often in the space of a week or two. This type of fluctuation was suspect because it did not square with the smoother and less volatile fluctuations one would have expected given the account's ostensible purpose.

        iii.    frequent substantial transfers of funds between this account and other non-APAM accounts at Sovereign Bank itself and at Fleet Bank. These transfers constituted red flags because, again, the transactions did not square with the ostensible nature of APAM's business, the investment of clients' money, and the ostensible role of the APAM account.

        e.     There were several unmistakable indicators that Bleidt was taking money from this APAM account and using it for: (i) personal purposes; and (ii) purposes inconsistent with the ostensible business of APAM. Looking at the checks drawn on the account, and at the records of wire transfers out of the account, would have shown that Bleidt was using money entrusted to APAM by investor-clients to pay for such things as: (i) tuition to Cushing Academy, a private school attended by one of Bleidt's sons; (ii) tuition to St. Bonaventure University, a university attended by another of Bleidt's sons; (iii) rent for residences Bleidt was renting; (iv) payment for Celtics tickets; (v) a personal life insurance policy Bleidt had with Manhattan National Life; and (vi) direct payments to Denise Bleidt, Bleidt's ex-wife. Moreover, even without looking at the checks and wire transfer records themselves, Sovereign Bank should have

been alerted to Bleidt's improper use of the funds entrusted to APAM by investor-clients by such facts as that: (1) the APAM account had an ATM feature which Bleidt used frequently to take money from the account in cash; and (2) there were, as stated earlier, frequent large transfers from the APAM account to Bleidt's personal account, to the bank account for Bleidt's radio station, and to the account for Financial Perspectives Planning Services, Inc. ("Financial Perspectives"), an investment advisory company headed by Bleidt. Sovereign Bank knew, or should have known, that one of the main purposes of these transfers was to pay the payroll for the radio station and for Financial Perspectives.

Financial Crimes Enforcement Network April 8, 2002 Assessment of
Civil Money Penalty Against Sovereign Bank, and Its Relevance Here

114.   At all relevant times, the Financial Crimes Enforcement Network ("FinCEN") has been the federal agency empowered to determine: (a) whether a financial institution, such as Sovereign Bank, violated the Bank Secrecy Act ("BSA"), 31 U.S.C. §§5311 et seq. and 31 CFR Part 103 thereunder; and (b) what, if any, sanction was appropriate.

115.   In April 2002, FinCEN issued an Assessment of Civil Money Penalty against Sovereign Bank. This Assessment was attached as Exhibit 2 to plaintiffs' December 7, 2006 Amended Complaint in this action, and is incorporated herein by reference.

116.   The Assessment shows FinCEN determined: (a) "that from June 1998, through May 2001, Sovereign failed to file timely approximately 2000 Currency Transaction Report ("CTR") forms for currency transactions in amounts greater than $10,000 as required by 31 CFR §103.22" (Assessment, p. 1); (b) that "[o]ver a two-year period, Sovereign Bank had experienced a number of extraordinary events, including several mergers and acquisitions and systems conversions" (id. at p.2); (c) that "[t]hese events strained Sovereign's compliance systems, leading to the failure to file CTRs" (id.); and (d) "that Sovereign failed to implement sufficient

internal controls and testing to insure that it filed accurate and timely CTRs, even after it was on notice that there were significant deficiencies in its BSA compliance" (id. at p.3).

117.    The Assessment further shows that, given the foregoing determinations, FinCEN "concluded that Sovereign's failures to file CTRs constitute[d] willful violations of the BSA" and assessed a civil money penalty against Sovereign of $700,000.  Assessment, p.3.

118.    The foregoing Assessment is relevant here because:  (a) it may be inferred that the same "extraordinary events" that FinCEN found to have "strained Sovereign's compliance systems, leading to the failure to file CTRs" in the period from June 1998 through May 2001, also strained Sovereign's compliance systems regarding, and during precisely the time it was taking over, the 125 Causeway Street branch and the sham APAM account; and (b) that this strain on Sovereign's compliance systems was a substantial contributing factor in Sovereign's failure to respond appropriately to the red flags regarding the sham APAM account.  Further, the April 2002 Assessment is relevant because it should have been a wake-up call to Sovereign to strengthen its compliance systems, and it may be inferred that Sovereign's failure to respond appropriately to this wake-up call was a substantial contributing factor in Sovereign's enabling Bleidt to continue his defrauding of his investor-clients, through the use of the sham APAM account at Sovereign, for the next two-and-a-half years.

Allegations Regarding Intervenor Plaintiffs

119.    During the time the sham APAM account was a Sovereign account, the intervenor plaintiffs lost the amounts shown on the two-page spreadsheet admitted into evidence as Plaintiffs' Trial Exhibit Number 16 in the December 2008 trial in this action.

120.    For each of the intervenor plaintiffs, the loss of money caused extraordinary financial difficulties, and great and continuing emotional distress.

<u>Claims</u>

COUNT I --
<u>Aiding and Abetting Breach of Fiduciary Duty</u>

121.    Intervenor plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

122.    As an officer, director and shareholder of APAM, Bleidt owed a fiduciary duty to APAM, and both Bleidt and APAM owed a fiduciary duty to APAM's investor-clients.

123.    Bleidt breached his fiduciary duty to APAM and to APAM's investor-clients, and also caused APAM to breach its fiduciary duty to APAM's investor-clients, by using money entrusted to APAM by the investor-clients contrary to the terms under which such money was entrusted.

124.    Sovereign Bank was well aware of the fiduciary duty owed by Bleidt to APAM, by APAM to its investor-clients and by Bleidt to APAM's investor-clients.  Indeed, these fiduciary duties and the steps needed to avoid breaching them, were recognized in federal statutory and regulatory anti-fraud laws applicable to investment adviser businesses -- laws that the bank was charged with knowing because, among other things, such laws governed the manner in which advisory client funds were to be deposited and maintained at a bank, and because holder-in-due-course status could not be asserted by any bank having notice of a breach of fiduciary duty.

125.    Sovereign Bank knew, was willfully blind to and/or acted with reckless disregard as to whether Bleidt and APAM were breaching their foregoing fiduciary duties.

126.    Sovereign Bank acted in such a way as to assist substantially, and to aid and abet, Bleidt's and APAM's violation of their foregoing fiduciary duties.

127.   As a result of Bleidt's and APAM's violation of their foregoing fiduciary duties, and of Sovereign Bank's aiding and abetting such violation, the intervenor plaintiffs sustained severe injury, loss and damage.

COUNT II --

Participation in Breach of Trust / Conversion:  Improperly
Accepting Trust Funds for Deposit, Improperly Allowing
Withdrawal of Trust Funds, with Notice of Breach of Fiduciary Duty

128.   Intervenor plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

129.   At all relevant times, Sovereign Bank knew that Bleidt was a fiduciary owing fiduciary duties to APAM and to APAM's investor-clients.

130.   Sovereign Bank is liable for participation in breach of trust and/or conversion because, and to the extent, Sovereign accepted trust funds (that is, funds as to which it knew or should have known Bleidt was a fiduciary) for deposit with notice of breach of fiduciary duty. Sovereign had notice of breach of fiduciary duty within the meaning of Restatement (Second) of Trusts §324 and M.G.L. c. 106 §3-307 because, among other things, the sham APAM account (or APAM "545 account") was "an account other than an account of the fiduciary, as such, or an account of the represented person" (§3-307(b)(2)(iii).

131.   Sovereign Bank is also liable for participation in breach of trust and/or conversion because, and to the extent, Sovereign allowed withdrawals of trust funds with notice of breach of fiduciary duty.  Sovereign had such notice because, among other things, Sovereign knew that at least some of the money deposited in the APAM 545 account was money from individuals intending that Bleidt invest such money on the individuals' behalf, and that Bleidt was

withdrawing money from the 545 account for purposes other than, and indeed contrary to, the

purpose of investing money on behalf of his investor-clients.

132.    Accordingly, Sovereign Bank is liable for all damage sustained by the intervenor

plaintiffs as a result of Sovereign's improperly allowing such deposits, and improperly allowing

such withdrawals.

132A.   The particular instruments that intervenor-plaintiffs claim that Sovereign Bank

converted by accepting them for deposit in the APAM 545 account with notice of breach of

fiduciary duty, are the instruments itemized on the List attached hereto as Exhibit 1.  Attached

hereto as Exhibit 1A is a listing of converted instruments by plaintiff or intervenor plaintiff.

Attached hereto as Exhibit 1B is a listing of instruments not included in Exhibit 1 or 1A bearing

on their face words showing that the instruments represented trust funds, that is, funds as to

which Bleidt was a fiduciary.[1]


COUNT III --

Negligence in Processing Transactions By Bleidt Sovereign
Bank Knew or Should Have Known Were Beyond
the Scope of the Authority Bleidt Had as APAM's Agent

133.    Intervenor plaintiffs repeat and reallege each of the preceding paragraphs of this

Complaint.

134.    In making withdrawals from, drawing checks on, and sending wire transfers of

funds out of, the sham APAM account, Bleidt was purportedly acting as the agent of APAM.

135.    With regard to the sham APAM account, APAM was Sovereign Bank's customer

and Sovereign Bank accordingly owed APAM a duty of due care.

---

[1] Given the difficulty inherent in assembling and analyzing the pertinent facts (difficulty arising in part from the fact that certain copies of checks that have been produced in this litigation are unclear), intervenors reserve the right to revise Exhibits 1, 1A and 1B.

136.    The foregoing duty of care included a duty to exercise reasonable care with regard to the issue of whether Bleidt, as the agent of APAM, was authorized to make the withdrawals from, draw the checks on, and send the wire transfers of funds out of, the sham APAM account that he was making, drawing and sending.

137.    The duty to exercise reasonable care regarding the foregoing issue in turn required Sovereign Bank to take reasonable steps to investigate facts suggesting that Bleidt might be acting for his own personal purposes rather than for his principal's -- APAM's -- purposes.

138.    As alleged above, there were many such facts.  But Sovereign Bank failed to take reasonable steps to investigate such facts.

139.    As a direct result of Sovereign Bank's foregoing failure to investigate, and of Sovereign Bank's overall violation of its duty of care regarding the issue of whether Bleidt was acting in breach of the authority Bleidt legitimately had as APAM's agent, the intervenor plaintiffs sustained severe injury, loss and damage.

COUNT IV --
Negligence that Effectively Permitted Bleidt to Shield
His Fraudulent Conduct from the Scrutiny of the SEC

140.    Intervenor plaintiffs repeat and reallege each of the preceding paragraphs of this Complaint.

141.    At all relevant times, APAM was an investment advisory and asset management firm registered with the SEC, and Bleidt was an investment advisor registered with the SEC.

142.    At all relevant times, Sovereign Bank knew, or should have known, that APAM and Bleidt were so registered with the SEC, and that both APAM's and Bleidt's activities were regulated by applicable federal law and subject to the scrutiny and oversight of the SEC.

143.    Accordingly, Sovereign Bank was obligated to exercise due care to ensure that Bleidt and APAM were not engaging in banking transactions that would have the effect of shielding Bleidt's and APAM's activities from the scrutiny of the SEC, or that would otherwise frustrate such scrutiny or make such scrutiny more difficult.

144.    Bleidt did in fact engage in precisely such conduct.  This conduct included, without limitation:  (a) maintaining a bank account (the sham APAM account referred to above) into which Bleidt was depositing the funds of investor-clients, while concealing the existence of this account from the SEC; and (b) causing the funds of investor-clients that Bleidt deposited in the sham APAM account to be transferred from that account to the bank account of Shared Visions.  Shared Visions had a bank account at Sovereign, and one of the "benefits" that accrued to Bleidt from transferring investor-client funds from the sham APAM account to the Shared Visions account is that, unlike APAM, Shared Visions was not regulated by the SEC or subject to the scrutiny of the SEC.  Accordingly, Bleidt's transfers of funds from the APAM account to the Shared Visions account was a species of money laundering.

145.    Sovereign Bank knew, is deemed to have known or should have known that a bank account into which an investment adviser deposits the funds of his investor-clients is a bank account that is required to comply with SEC regulations pertaining to such bank accounts.  These regulations include, among other things, a requirement that the investment adviser report the existence of all such bank accounts to the SEC.

146.    Not only did Sovereign Bank fail to take any of the steps it should have taken to ensure that the bank account into which Bleidt was depositing client funds complied with SEC regulations; Sovereign Bank actually aided and abetted Bleidt's violation of such regulations by, among other things, sending the bank statements for this account to Bleidt's home address rather

26

than to APAM's business address.  Had the Bank sent the bank statements to APAM's business

address, as the Bank clearly should have done, Bleidt would not have been able to conceal the

existence of this account from the SEC, and would not have been able to use the account as he

did, to steal money from his clients.

147.    Further, in the exercise of the duty of due care Sovereign Bank owed to its

customer APAM and to APAM's investor-clients, Sovereign Bank should have conducted a

reasonable investigation of the transfers from APAM to Shared Visions.

148.    Sovereign Bank failed to conduct such an investigation, and otherwise violated

the duty of care it owed to APAM and APAM's investor-clients by, among other things, aiding

and abetting Bleidt's concealment of the sham APAM account from the SEC.  As a direct result,

the intervenor plaintiffs sustained severe injury, loss and damage.


COUNT V --
Violation of M.G.L. c. 93A

149.    Intervenor plaintiffs repeat and reallege each of the preceding paragraphs of this

Complaint.

150.    At all relevant times, Sovereign Bank has engaged in trade and/or commerce

within the meaning of M.G.L. c. 93A §2.

151.    Sovereign Bank has engaged in unfair and/or deceptive acts and/or practices

within the meaning of M.G.L. c. 93A §2, as a direct result of which acts and/or practices the

intervenor plaintiffs have sustained severe injury, loss and damage.

152.    These unfair and/or deceptive acts and/or practices include those described in a

demand letter that plaintiffs sent to Sovereign Bank on September 19, 2006, more than 30 days

prior to the filing of their December 7, 2006 Amended Complaint in this action.  This demand

letter, attached to that Amended Complaint, is incorporated herein by reference.  The description

of the unfair and/or deceptive acts and/or practices committed by Sovereign Bank contained in

plaintiffs' September 19, 2006 demand letter is incorporated herein by reference.

153.    Sovereign's unfair and/or deceptive acts and/or practices also include the

following:

a.    In the wake of the discovery of Bleidt's fraud in November 2004,

Sovereign failed to do an appropriate investigation of the fraud, and failed to explore how

deficiencies in the Bank's policies and procedures and deficiencies in the Bank's training of its

employees may have allowed and facilitated the fraud.  Sovereign also failed to investigate and

consider what changes in its policies and procedures, and what changes in its training, might be

appropriate to prevent in the future a fraud similar to the fraud committed by Bleidt.  Sovereign

has sought to defend its foregoing failures on the ground that Sovereign's only obligation is to

the Bank and its customers, and that Sovereign owes no duty to non-customers of the Bank such

as the Bleidt victims.

b.    Sovereign's foregoing justification for its failure to take appropriate action

in the wake of the discovery of Bleidt's fraud is meritless.  First, the victims of Bleidt's fraud did

indeed include customers of the Bank.  Second, the Bank does owe duties to non-customers,

especially non-customers who entrust their money to fiduciaries who deposit this money at the

Bank.

c.    Sovereign's failure to take appropriate action in the wake of Bleidt's fraud

has constituted a violation of M.G.L. c. 93A because such failure has been:  (a) knowing and

intentional; (b) in violation of the Bank's legal and ethical obligations; and (c) contrary to the

way Sovereign Bank represents itself to the public in its advertising and marketing.

153A.   On July 3, 2009, intervenor plaintiffs sent a demand letter to Sovereign Bank (reproduced as Exhibit 2 hereto) describing the foregoing unfair and/or deceptive acts and/or practices, and making a written demand for relief within the meaning of M.G.L. c.93A §9(3).

153B.   On September 10, 2009, Sovereign Bank sent intervenor plaintiffs a letter (reproduced as Exhibit 3 hereto) responding to intervenor plaintiffs' July 3, 2009 demand. Sovereign Bank's response refused to make any tender of settlement in response to that demand.

154.   Plaintiffs' September 19, 2006 letter made a written demand for relief within the meaning of M.G.L. c. 93A §9(3).

155.   On October 19, 2006, Sovereign Bank sent plaintiffs a letter, reproduced as Exhibit 4 to plaintiffs Amended Complaint, responding to plaintiffs' September 19, 2006 demand.  Sovereign Bank's response refused to make any tender of settlement in response to plaintiffs' demand.

R 156.   Sovereign Bank's refusals to grant relief upon demand in response to plaintiffs' September 19, 2006 demand letter and in response to plaintiffs' July 3, 2009 demand letter were made in bad faith, with knowledge or reason to know that the conduct complained of violated M.G.L. c.93 §2.

R 157.   Intervenor plaintiffs are entitled to multiple damages and attorney's fees both: (a) because of the inadequacy of Sovereign Bank's responses to plaintiffs' demand letters; and (b) because the violations of M.G.L. c.93A §2 by Sovereign Bank were willful and/or knowing violations.  Intervenor plaintiffs are also entitled to declaratory and injunctive relief.

158.   Intervenor plaintiffs are entitled to relief either under M.G.L. c. 93A §9 or under M.G.L. c. 93A §11.

COUNT VI --
Common Law Conversion and Conversion Within the
Meaning of M.G.L. c.106 §3-420(a) Second Sentence

159.    Intervenor plaintiffs repeat and reallege each of the preceding paragraphs of this

Complaint.

160.    Intervenor plaintiffs gave Bleidt various checks which Bleidt presented to

Sovereign Bank for deposit in the sham APAM account notwithstanding that the checks were not

properly endorsed.

161.    Sovereign Bank accepted the foregoing checks for deposit into the sham APAM

account notwithstanding that the checks lacked proper endorsements.

162.    In accepting the foregoing checks for deposit, Sovereign Bank committed

common law conversion and conversion within the meaning of the second sentence of M.G.L.

c.106 §3-420(a).

163.    Accordingly, Sovereign Bank is liable to intervenor plaintiffs regarding checks

Sovereign Bank converted by accepting them for deposit in the sham APAM account

notwithstanding that the checks lacked proper endorsements.

163A.   The particular instruments that intervenor plaintiffs claim that Sovereign Bank

converted by accepting them for deposit in the APAM 545 account notwithstanding that they

lacked proper endorsements are the instruments so identified on the List attached hereto as

Exhibit 1.[2]

---

[2] Thus, certain checks were converted by Sovereign in two different senses:  (1) on account of
being accepted for deposit with notice of breach of fiduciary duty (Count II); and (2) on account
of being accepted for deposit notwithstanding the lack of a proper endorsement (Count VI.)

As indicated in Count II, especially given that certain copies of checks that have been produced
in this litigation are unclear, intervenors reserve the right to revise the List attached hereto as
Exhibit 1.

<u>Prayer for Relief</u>

WHEREFORE, intervenor plaintiffs respectfully request:

1.     that the Court enter judgment for each intervenor plaintiff on each Count of the Complaint awarding appropriate damages in excess of $75,000, plus interest, costs and attorney's fees;

2.     that the Court issue declaratory and injunctive relief to remedy Sovereign's failure to take appropriate remedial action in the wake of the discovery of Bleidt's fraud; and

3.     that the Court grant such other and further relief as the Court may deem just and proper.

INTERVENOR PLAINTIFFS DEMAND TRIAL BY JURY OF ALL ISSUES SO TRIABLE.

Dated:  December 21, 2009

Respectfully submitted,


    /s/ Melanie L. Oxhorn
Melanie L. Oxhorn, BBO No. 145458
450 E. 63rd St., #6C
New York, NY 10065
(212) 593-0172


    /s/ David J. Fine
David J. Fine, BBO No. 165120
Law Offices of David J. Fine
1 State Street, Suite 1500
Boston, MA 02109
(617) 720-2942

Attorneys for Intervenor Plaintiffs

<u>Certificate of Service</u>

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:   January 6, 2010

_____/s/ David J. Fine_____
David J. Fine, BBO No. 165120